No. 55,275

FRANCES ALLENE OLSON, Individually and as Administratrix of the Estates of Willard V. Harshman, Deceased, *et al., Appellee/Cross-appellant,* v. FRANK KNOX HARSHMAN, *et al., Appellant/Cross-appellee.*

(668 P.2d 147)

Opinion filed August 4, 1983.

*Craig Shultz,* of Shultz, Fisher, Monnat & Shultz, of Wichita, argued the cause and was on the briefs for appellant/cross-appellee.

R. *Douglas Reagan,* of Foulston, Siefkin, Powers & Eberhardt, of Wichita, argued the cause, and *Jerry G. Elliott* and *Mikel L. Stout,* of the same firm, and *Charles R. Rayl,* of Rayl & Fowler, Chartered, of Cottonwood Falls, and *William T. North,* of Masoner & North, of Cottonwood Falls, were with him on the brief for appellee/cross-appellant.

The opinion of the court was delivered by

MILLER, J.: This is an action by Frances Olson, individually and as administratrix of the estates of her parents, Willard and Clara Harshman, to set aside revocable inter vivos trusts executed by each of her parents during their lifetimes. The trusts, by their terms, transferred virtually all of the elder Harshmans' property, being shares of stock in Harshman Farms, Inc., to Frances' brother, the defendant, Frank Knox Harshman. The case was tried with an advisory jury, which, under the trial court's instructions, found that Frank Harshman occupied a fiduciary or confidential relationship with his parents in 1968 when their trusts were prepared and executed and in 1970 when amendments to the trusts were prepared and executed. The jury also found that Frank unduly influenced his parents in the preparation and execution of the trusts and amendments. The trial court adopted the findings of the jury and entered judgment setting aside the trusts and ordering Frank to make appropriate stock transfers to the administratrix. The trial court also set aside certain transfers of stock made by inter vivos gifts by the elder Harshmans to Frank and to his sons over a period of several years. Frank appeals from these orders, and Frances has cross-appealed on the question of the validity of some Harshman Farms stock redemptions made by Frank to pay federal estate taxes on his parents' estates.

The focus of this dispute is two parallel trust instruments, one executed by Willard Harshman and one by Clara Harshman, in 1968. The trusts thereby created were revocable and provided that each settlor was the primary beneficiary of the trust during the settlor's lifetime. Each settlor transferred the bulk of his or her personal assets (consisting of shares of stock in Harshman Farms, Inc.) to the trust. Each trust agreement directed that upon both settlors' deaths all property held in trust was to be distributed to Frank Harshman and to his children. Each trust made no provision for the Harshmans' only other child, the plaintiff, Frances Olson. The Willard Harshman trust agreement states:

"The Grantor has intentionally made no provisions herein for his daughter, FRANCES ALLENE OLSON, or the children of FRANCES ALLENE OLSON, because of the gifts and financial assistance the Grantor and his wife have provided FRANCES ALLENE OLSON and her children over the years and because of the estranged relationship that has existed for many years between the Grantor's said daughter and her children with the Grantor and his wife."

The Clara Harshman trust instrument contains an almost identical declaration. Both documents designated Frank Harshman as trustee. The 1970 amendments were of lesser importance and do not affect the exclusion of Frances Olson.

Numerous issues are raised, but those determinative of this appeal are whether there is substantial, competent evidence in the record before us to support the trial court's findings of confidential or fiduciary relationship and undue influence. Before discussing the evidence, we will first discuss the standards which govern appellate review of this case and some of the applicable principles of law.

Appellate review of the existence of a fiduciary or confidential relationship was recently discussed in *In re Estate of Relihan*, 4 Kan. App. 2d 277, 604 P.2d 1219 (1980), where it was said:

"The existence or non-existence of a confidential or fiduciary relationship is an evidentiary question or finding of fact which must be determined from the facts in each case; and, therefore, the scope of appellate review is to ascertain only whether there is substantial competent evidence to support the finding of the trial court. *Cersovsky v. Cersovsky*, 201 Kan. 463, 468, 441 P.2d 829 (1968); *Wilkinson v. Cummings*, 194 Kan. 609, Syl. ¶ 3, 400 P.2d 729 (1965); *Fairbank v. Fairbank*, 92 Kan. 45, 139 Pac. 1011 (1914)." 4 Kan. App. 2d at 279.

In passing on a trial court's determination of the existence or nonexistence of a fiduciary or confidential relationship, an appellate court is required to consider the evidence in its most favorable aspect in relation to the party who prevailed in the court below. *Curtis v. Freden*, 224 Kan. 646, 652, 585 P.2d 993 (1978); *Riedel v. Gage Plumbing & Heating Co.*, 202 Kan. 538, 449 P.2d 521 (1969); and *In re Estate of Relihan*, 4 Kan. App. 2d at 279.

The nature of a fiduciary and confidential relationship in this state was discussed at length in *Denison State Bank v. Madeira*, 230 Kan. 684, 640 P.2d 1235 (1982). Justice Holmes, speaking for a unanimous court, said:

"The determination of what constitutes a fiduciary relationship has been before this court on numerous occasions. *Dugan v. First Nat'l Bank in Wichita*,

227 Kan. 201, 606 P.2d 1009 (1980); *Ford v. Guarantee Abstract & Title Co.,* 220 Kan. 244, 553 P.2d 254 (1976); *Wolf v. Brungardt,* 215 Kan. 272, 524 P.2d 726 (1974); *Lindholm v. Nelson,* 125 Kan. 223, 264 Pac. 50 (1928). It may be said that generally there are two types of fiduciary relationships: (1) those specifically created by contract such as principal and agent, attorney and client, and trustee and cestui que trust, for example, and those created by formal legal proceedings such as guardian and/or conservator and ward, and executor or administrator of an estate, among others, and (2) those implied in law due to the factual situation surrounding the involved transactions and the relationship of the parties to each other and to the questioned transactions. The determination of the existence of a fiduciary relationship of the first category, though not without problems on occasion, is usually relatively simple. The second category, with which we are faced in this case, becomes much more difficult to determine and must depend upon the facts in each case. In *Curtis v. Freden,* 224 Kan. 646, 585 P.2d 993 (1978) this court stated:

" 'Whether or not a confidential or fiduciary relationship exists depends on the facts and circumstances of each individual case. This court has refused, for that reason, to give an exact definition to fiduciary relations.' p. 651.

"The concept of the fiduciary duty is an equitable one and while no precise definition may be given and strict parameters of the relationship cannot be established for use in all cases, there are certain broad general principles which should be considered in making the determination of whether a fiduciary relationship exists in any particular factual situation.

"A fiduciary relationship imparts a position of *peculiar confidence placed by one individual in another.* A fiduciary is a person with a duty to *act primarily for the benefit of another.* A fiduciary is in a position to have and exercise, and does *have and exercise influence over another.* A fiduciary relationship implies a condition of *superiority of one of the parties over the other.* Generally, in a fiduciary relationship, the property, interest or authority of the other is *placed in the charge of the fiduciary.* See generally, 36A C.J.S., Fiduciary, p. 381 *et seq.*

" 'Courts of equity have carefully refrained from defining the particular instances of fiduciary relations in such a manner that other and perhaps new cases might be excluded, and have refused to set any bounds to the circumstances out of which a fiduciary relation may spring.

. . . .

" '[I]t extends to every possible case in which a fiduciary relation exists in fact, and in which there is *confidence reposed* on one side *and resulting domination and influence* on the other.' pp. 385, 386-7. (Emphasis supplied.)

"In an old Indiana Appellate Court case, we find some definitive elements which may be relevant in determining whether a fiduciary relationship exists. " 'There is no invariable rule which determines the existence of a fiduciary relationship, but it is manifest in all the decisions that there must be not only confidence of the one in the other, but there must exist a certain inequality, dependence, weakness of age, of mental strength, business intelligence, knowledge of the facts involved, or other conditions, *giving to one advantage over the other.'* *Yuster v. Keefe,* 46 Ind. App. 460, 466, 90 N.E. 920 (1910). . . .

"In *Lindholm v. Nelson,* 125 Kan. 223, [264 Pac. 50 (1928)] the court held:

" 'A fiduciary relation does not depend upon some technical relation created

by, or defined in, law. It may exist under a variety of circumstances, and does exist in cases where there has been a special confidence reposed in one who, in equity and good conscience, is bound to act in good faith and with due regard to the interests of the one reposing the confidence.' Syl. ¶ 3." 230 Kan. at 691-92. (Emphasis in original.)

We discussed a claim of fiduciary relationship in the recent case of *Cornett v. Roth*, 233 Kan. 936, 666 P.2d 1182 (1983). In Syllabus ¶ 1, we said:

"While there is no invariable rule which determines the existence of a fiduciary relationship it is manifest that there must not only be confidence of one in another, but *there must also exist a certain inequality; dependence; weakness of age, mental strength, business intelligence, knowledge of the facts involved, or other conditions, giving to one an advantage over the other.*" (Emphasis supplied.)

Also in *Curtis v. Freden*, 224 Kan. 646, 651, we said:

"The mere relationship of parent and child does not raise a presumption of a confidential and fiduciary relationship. [Citations omitted.] Neither does the fact that a gift or real estate is made by deed from a parent to a child in and of itself raise a presumption of overreaching . . . . [Citation omitted.]"

In the context of a will contest, this court has defined "undue influence." In the recent case of *In re Estate of Robinson*, 231 Kan. 300, 306, 644 P.2d 420 (1982), we quoted with approval the following language from *In re Estate of Ziegelmeier*, 224 Kan. 617, 622, 585 P.2d 974 (1978):

"Generally, undue influence or fraud, to invalidate a will, must amount to coercion, compulsion or constraint which destroys the testator's free agency, and by overcoming his power of resistance obliges him to adopt the will of another instead of exercising his own, and *it must be brought to bear directly on the testamentary act.*" (Emphasis supplied.)

In 89 C.J.S., Trusts § 76(a), pp. 865-66, it is said:

"Where a declaration of trust is procured by undue influence, it is invalid and unenforceable and may be set aside . . . . The influence exerted on the creator of the trust must be undue. The influence which the law condemns as undue is that which is operative to such a degree as to amount in effect to coercion. It is a kind of mental coercion which destroys the free agency of the creator of the trust and constrains him to do that which is against his will."

Undue influence, instrumental in procuring the execution of a trust, constitutes grounds for setting it aside. The mere fact that the trustee was the confidential adviser of the grantor is not sufficient to cause the setting aside of the trust, where it appears that the grantor acted on his independent judgment. 76 Am. Jur.

2d, Trusts § 93; and see Annots., 38 A.L.R. 941, 977; 91 A.L.R. 102, 116; and 131 A.L.R. 457, 474.

We turn now to the factual background. Willard and Clara Harshman had two children, Frank Harshman and Frances Olson. Frances is married to Webster Olson. In the early 1940's, the elder Harshmans owned some 2,000 acres of land in Chase County, about one-third of which was tillable, and they raised Shorthorn cattle. From about 1940 to 1949, the farming and cattle-raising operation was carried on by Willard Harshman, Frank Harshman and Webster Olson. The Olsons owned a separate tract of land, approximately a quarter section, which they farmed and operated separately. By 1948, the Olsons were no longer happy with the joint farming arrangement, finding that they could no longer live on the share of the income which came to them from that arrangement. Various difficulties arose between Webster Olson and Frank Harshman, and Mrs. Olson testified that Frank constantly misrepresented things to his mother. One incident related in the evidence is that Olson had planted corn on a small piece of bottom land, and because of drought the crop didn't mature; what little there was ended up as ensilage. Frank said to Olson in substance that if Olson didn't think he got enough out of that piece of land as his share, that Frank would like to take it and put it into wheat. Olson agreed. Later, Frank told his mother that Olson didn't want that tract. Additionally, Frank was critical of the way Olson maintained the machinery, and would recheck to make sure that Olson greased the equipment properly. Frank was also critical, claiming Olson stored his combine where it was in the way. All these things occurred in the 1940's. Frank was living at home, and the Olsons were convinced that he was getting more than his share of the income and doing less than his share of the work. Mrs. Olson testified that finally, in 1948, she told her mother:

"I felt like we were being treated unfairly. . . . Frank was continually reporting to mother things that were not the way he'd represented them to be.
. . . . .
"I told her that she could figure out a way that we could make a living if she wanted us to remain in the community. If she wanted to associate with me and her grandchildren, that it was up to her to figure out a way we could make a living. And she knew that I meant it."

The Olsons ceased participation in the family farming and ranching operation in 1949, and developed their own operation.

Willard and Clara Harshman conveyed two tracts of land, 120 acres known as the Soper place and 39 acres described as the Meierhoff, to Frances and Webster Olson in 1950; and commencing in that year and continuing thereafter, the Olsons carried on a separate farming operation of their own. Frank, meanwhile, lived at home and continued in the family operation with his father. In the mid-1950's Willard and Clara helped Frances and Webster buy another farm and about the same time the elder Harshmans conveyed all of their remaining land to their son, Frank, reserving only a life estate. Two witnesses testified that about that time Frank said that Frances had received all of her parents' property that she would ever receive. Frank denied making such statements. In 1958, on the advice of a Kansas City certified public accountant who did the Harshmans' tax work, a corporation, Harshman Farms, Inc., was formed. Frank was president and Willard and Clara were the other corporate officers. Ten thousand shares of stock were issued, 3,333 shares each to Willard and Clara and 3,334 shares to Frank. Frank conveyed all of the Harshman land to the corporation and Willard and Clara conveyed their remaining interest to it. The corporation has continued in existence to the present time. The elder Harshmans put their social security and oil royalty income in the corporation bank account, and apparently all three—Frank, Willard and Clara—had checking privileges.

W. L. McFillen, an agricultural engineer from Kansas City, Kansas, became acquainted with Frank and with the elder Harshmans in 1965 or possibly earlier. McFillen was doing range management and water supply work in the area, and Frank was operating heavy equipment doing earth moving. McFillen and Frank discussed estate planning and Frank advised McFillen of the incorporation of Harshman Farms, Inc., as the Harshmans' estate plan. He told McFillen that the accountant had advised it. McFillen later discussed this with the Harshmans' accountant, and then with Wayne Davidson, a lawyer in Kansas City, Missouri, who did McFillen's tax work. As a result of these conversations, McFillen was convinced that the mere incorporation would not solve all of the Harshmans' estate tax problems and so advised Frank. While the record is not clear, apparently Frank contacted Davidson and set up an appointment for Davidson to come to Chase County to counsel with the elder

Harshmans. McFillen and Davidson drove down from Kansas City together, met Frank at his place, and then went over to the Harshman home. Frank and McFillen left and went somewhere else for a good portion of the day; Mr. Davidson spent that time with Mr. and Mrs. Harshman.

Wayne Davidson testified that he received his law degree from Washburn University in 1960, and he has been a practicing attorney for some twenty years. He devotes approximately fifty percent of his time to probate and estate planning and the rest to tax, corporate, and general business law. He does not recall who contacted him but he went down to the Harshman home with Mr. McFillen in early 1968. He met Frank Harshman and talked with him some during the visit, but Frank was not present when he talked with Willard and Clara Harshman about their estate planning. They told him some of their desires regarding the disposition of their property, and he made suggestions as to alternate plans that were available to them. Portions of his testimony were as follows:

"Q. What did they tell you with regard to their desires concerning their disposition of their estate?

"A. Well, they wanted to make sure that one of their children was not included. . . . They wanted to make sure that Mrs. Olson was not a beneficiary of their estate.

"Q. Did they say why?

"A. Well, they primarily said that it was because of the fact that they had an estranged relationship with her and the substance of what I got from the conversation on that trip, was that Mrs. Olson lived a fairly short distance from the Harshmans, and for some reason they felt that she did not spend enough time with them, or not visit them on regular occasions, and I get the feeling that the problem stems from that somewhat.

"Q. Okay. Did you discuss with them the aspects of leaving a child out of their planning?

"A. Yes. I told them it was a very serious step. . . . And I advised them in the event that they desired to omit their daughter from their estate planning, that it should be so specified in their documents.

"Q. There is language in both of the trusts to the effect that there was an estrangement, or estranged relationship. Is that how—did they use that word to you?

"A. They didn't use that word, no. That's my word. They used words like, she didn't pay any attention to them. And there's hard feelings among the family. And she did not visit them. She lived close by and did not visit them.

"Q. So, that was you—that was your choice of words by virtue of being a draftsman, is that correct?

"A.  Yes, sir.

"Q.  Now, following your—the first contact that you had with Willard and Clara Harshman, what, if anything, did you do?

"A.  Well, after the first contact, we just went over in general, what they had—what they desired. I gave them some ideas about what the Federal estate tax impact might be. And I found that they, like most clients, had developed substantial estates, and do not realize the tax impact. I told them what I thought could be done in general. I thought that we could do some planning that would take advantage of the Federal estate tax major deduction, and just off the top of my head, I estimated that we could carve the tax bill in half, whatever half might be. And told them that it would probably necessitate the preparation of trust agreements, and I said that for two or three reasons, the Federal estate tax planning is much easier to do with the trust agreement.

"The type of trust agreement I had in mind was a trust agreement that eliminated probate. It eliminated attorney fees. At least to a large extent, it eliminated all Executor fees and eliminated the delays associated with probate. And I thought—I thought that was an appropriate approach for them; for the simple reason that the bulk of their assets, if not all their assets, were tied up in the stock of Harshman Farms.

"So, Mr. Harshman—Mr. Willard Harshman, owned a piece of paper that represented roughly a third of the outstanding stock of Harshman Farms, Inc. And I thought that it was not appropriate to have that one piece of paper go through probate and justify a substantial attorney fee, or substantial executor's fee, just to probate that one document—that one piece of paper. In other words, you'd be paying a high price, just to get the title changed on that one piece of paper, from Mr. Harshman's name to his desired beneficiaries.

"Q.  Okay. Now, the type of planning that you recommended to Mr. and Mrs. Harshman, was that an unusual plan at that time?

"A.  No, not at all. I have done substantial work in the revocable trust, intervivos trusts—meaning during life. I've done substantial work in that area. Many lawyers do.

"Q.  Okay. Now, the trusts that you eventually drew, those were revocable trusts?

"A.  Yes.

"Q.  What does that mean. Would you explain?

"A.  Revocable, means the right to revoke it or amend it at any time during your life. It—basically, it's just a document that you enter into during your life, but reserve the power to change it.

"Q.  Does that mean then, that either of these trusts could have been revoked or changed at any time prior to the death of either Clara or Willard Harshman?

"A.  Yes.

"Q.  When you spoke with them, what was your impression regarding the Harshmans, concerning their health, and mental well being?

"A.  Well, Mr. Harshman was—seemed to be in excellent physical health for a man his age. And I know that on all occasions that I have seen him, he

was able to work, and like a younger man. He seemed to be very mentally alert.

"Mrs. Harshman was very mentally alert in my opinion. She—I think her physical condition was much worse than Mr. Harshman's. She was not able to get around like he was. Most of the times that I saw Mrs. Harshman, was in her home. I have been in the automobile with her, gone on short trips while she was in the car, and I had no question at all about her mental alertness. But her physical condition, I think she suffered from arthritis and perhaps other things, but it was a little harder for her to get around.

"Q. Were they indecisive at all in expressing their desires to you?

"A. No, not at all. They knew exactly what they wanted. They didn't know the exact form they wanted, but they knew the results they wanted.

"Q. What was that?

"A. The results they wanted, they wanted Frank and his children, to end up with everything they owned.

"Q. Did you ask them that they had discussed that with Frank?

"A. I don't recall if I asked them that or not.

"Q. Let me ask it a different way. Do you have any knowledge that they, at any time, discussed that with Frank?

"A. Oh, I'm sure they did, after I suggested certain planning, because that certain planning arrived at that result. It arrived at the result of the assets of Mr. and Mrs. Harshman, after the death of both of them, eventually going to Frank, or if Frank was deceased, to his children.

"Q. Did you discuss the planning you were going to do for them, with Frank?

"A. At the first meeting?

"Q. Well, let's start there, yes. At the first meeting.

"A. No, not at the first meeting.

"Q. At any time?

"A. Oh, I had discussed it in general with Frank, and there were several decisions that involved Frank. They wanted to name Frank as the trustee of their trusts. And I think it's important to know exactly what I set up. I set up a revocable trust agreement whereby Mr. Harshman, for example, named Frank Harshman as the trustee of his estate during his life. And I suggested that he name a bank.

. . . .

"Q. . . . Did you discuss with Willard and Clara Harshman, your preference I take it, for a corporate trustee, or a bank being trustee, as opposed to an individual?

"A. Yes, I did.

"Q. And what, if anything, reaction did you get from them?

"A. They wouldn't consider it. Wouldn't consider it.

"Q. Do you know why?

"A. Well, I presume they were just skeptical of banks. I don't know if they have had bad luck with banks in the past, or the fact that just their personalities, but I find many people are fearful of banks. But they just wouldn't hear of it."

Mr. Davidson testified further as to the estate tax savings that

could be effected. He discussed with Frank the responsibilities of serving as trustee, and Frank finally agreed to serve. Ultimately, Mr. Davidson prepared trust agreements for Willard and Clara Harshman. He did some research and then outlined the plan in a letter; the Harshmans took this letter to a Chicago attorney who supposedly is one of the authorities in the estate planning field. After they talked to the Chicago lawyer, they told Mr. Davidson to go ahead, and he prepared separate proposed drafts of trust agreements and wills for Mr. and Mrs. Harshman. He took these down and discussed them with the Harshmans in August or September, returned to Kansas City and prepared final drafts. The latter were executed on October 5, 1968. Davidson took the documents to their home and explained the provisions to them and satisfied himself that both Mr. and Mrs. Harshman understood what each document was doing and that they were satisfied that the property would ultimately be transferred to Frank and his children. The trusts were executed at the bank in Elmdale. Later, in 1970, certain amendments to both trust agreements were prepared and executed, the basic change being that instead of certain assets being held in trust until the grandchildren were twenty-five years of age, the trusts ceased upon the deaths of both Mr. and Mrs. Harshman. The trusts were revocable and could have been revoked by either Mr. or Mrs. Harshman at any time prior to their respective deaths. Davidson felt that he was employed by Mr. and Mrs. Harshman. He was paid for his services by a check drawn on Harshman Farms, Inc., signed by Frank Harshman.

Mr. and Mrs. Harshman were in their eighties when the trusts were executed. Mr. Harshman was in good health, and could still do a good day's work, but Mrs. Harshman suffered from arthritis and was not robust. There is no evidence, however, that either Willard or Clara Harshman were lacking in mental capacity at the times the trust documents were executed. On the contrary, the only evidence is that both of them were mentally competent and alert, with clear and definite ideas about the disposition of their property.

Frank served as president of Harshman Farms, Inc., from its formation forward, and he was the primary decision-maker on matters concerning the farming operation. By the 1960's Frank was an authorized signatory on his parents' bank accounts. He

lived close to them, was in daily contact with them during their lifetimes, and he was obviously a person whom they trusted and relied upon. Certainly as a corporate officer and director, Frank occupied a position of trust and had a fiduciary duty to the corporation and its shareholders. *Newton v. Hornblower, Inc.,* 224 Kan. 506, Syl. ¶ 8, 582 P.2d 1136 (1978); and see *Delano v. Kitch,* 663 F.2d 990 (10th Cir. 1981), *cert. denied* 456 U.S. 946 (1982). Also, as a signatory on his parents' bank accounts in the 1960's, Frank could incur liability if he misused the funds thus available to him. He is not charged, however, with any breach of fiduciary duty arising from his capacity as a corporate officer or director, or as signatory on his parents' bank accounts.

There simply is no evidence that the senior Harshmans relied upon Frank in the preparation of the trust agreements here attacked. There is no evidence that either lacked mental faculties; the only evidence is that both Willard and Clara Harshman were, even in advanced years, completely competent and alert. Both knew precisely what they wanted to do with their property and unhesitatingly directed their attorney as to the results each desired. Frank was not present during the attorney-client conferences and had no part in formulating the terms of the trusts excepting his acceptance of the trusteeship, a matter insisted upon by his parents. The fact that Frank called the attorney, a recommended specialist in the field and a stranger to him, is of little moment; and the fact that Frank paid the attorney from the corporate account at a time when his parents maintained no personal bank accounts certainly does not indicate any undue influence on his part.

We conclude that there is not sufficient competent evidence, when viewed in a light most favorable to the plaintiff, to support the trial court's finding of a fiduciary or confidential relationship, or of undue influence. Assuming, arguendo, that a fiduciary or confidential relationship was established, there was absolutely no evidence linking that relationship with the execution of the trusts or indicating that Frank had the kind of influence which would amount to coercion, or the overpowering of the will of his parents, or the substitution of his will for theirs. The trust instruments were prepared according to *their* instructions, not *his.*

A number of other issues are raised, including an attack on the

jury instructions (which improperly placed an undue burden on the defendant), but we need not decide those in view of our decision as to the sufficiency of the evidence, which is dispositive of the case. The cross-appeal likewise need not be considered or determined in light of our conclusion that the trusts are valid.

The judgment is reversed.