**PIZZA MANAGEMENT, INC., a Texas Corporation, et al., Plaintiffs,**

v.

**PIZZA HUT, INC., a Delaware Corporation, et al., Defendants.**

**No. 86–1664–C.**

United States District Court,
D. Kansas.

May 11, 1990.

Gary M. Austerman, Alexander B. Mitchell of Klenda, Mitchell, Austerman & Zuercher, Wichita, Kan., for plaintiffs.

John J. Murphy of Foulston & Siefkin, Wichita, Kan., and Arthur S. Friedman of Friedman, Wang, Bleiberg & Heimer, New York City, for defendants.

## MEMORANDUM AND ORDER

CROW, District Judge.

The case comes before the court on the defendants' motion to dismiss (Dk. 392) and motion for summary judgment (Dk. 394). As this case is one of the oldest on the court's docket, this court has promptly taken up the motions before it. A complete summary of the lengthy history to this case would require more effort than deserving of the result. Suffice it to say, the court is quite familiar with the basic disputes involved herein after having entertained and decided several applications for a temporary restraining order or preliminary injunction, several motions to review orders of the magistrate, a motion to amend a supplemental complaint, motions for partial summary judgment filed by all parties, a motion to reconsider the partial summary judgment order, and a motion for leave to file a second amended complaint. The new wave of motions are again aggressively contested with plaintiffs' response to the *motion for summary judgment* comprising no less than two hundred pages of text and four volumes of exhibits. Because of the sheer breadth and complexity of these motions, the court makes no attempt to organize its discussion comprehensively and is content simply to address *seriatim* the issues and arguments. The length of this order indicates the effort this court made to address most of the significant arguments advanced in the motions and responses. In its discretion, the court, however, has chosen not to address individually certain arguments and issues because either they are seriously lacking in merit or the rationale of the court's rulings on related issues is also controlling on them.

## MOTION TO DISMISS

Defendants move to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) these counts of plaintiffs' second amended complaint which are captioned in the complaint as follows:

count II—reformation, count IV—tortious interference with prospective business advantage, count V—tortious interference with contract/promissory and equitable estoppel, count VI—civil conspiracy, count X—breach of contract-breach of duty of good faith and fair dealing, and count XII—promissory estoppel/equitable estoppel.

In deciding a motion to dismiss, the court must accept as true on their face the well-pleaded factual allegations in the complaint, and all reasonable inferences are drawn in favor of the plaintiffs. *Shaw v. Valdez*, 819 F.2d 965, 968 (10th Cir.1987). Allegations must be construed most favorably for the plaintiffs. *Huxall v. First State Bank*, 842 F.2d 249, 251 (10th Cir. 1988). Dismissal is appropriate only if it appears beyond a reasonable doubt that a plaintiff can prove no set of facts in support of its claim which would entitle it to relief. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957). The sufficiency of the complaint is not assessed from whether the plaintiff may ultimately prevail but from whether plaintiff is entitled to present evidence in support of its claims. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). Dismissal is a harsh remedy to be used cautiously so as to promote the liberal rules of pleading and to protect the interests of justice. *Cayman Exploration Corp. v. United Gas Pipe Line*, 873 F.2d 1357, 1359 (10th Cir.1989).

Plaintiffs attempt to delimit the force of the defendants' motion to dismiss by characterizing it as essentially a motion to reconsider the court's earlier order which granted plaintiffs leave to file their second amended complaint over defendants' objections of futility. In reply, defendants first explain that their arguments opposing the motion to amend were narrowly made and then correctly note that the court did not analyze their arguments in any depth and chose, instead, to await the expected dispositive motions. Defendants' motion to dismiss is not merely a motion to reconsider and its scope will not be so circumscribed.

**1158**

## COUNT II—REFORMATION

In this count, plaintiffs seek reformation of two written instruments, the 1976 Agreement and 1981 Blanket Amendment. Defendants seek to dismiss this claim contending it is barred by the statute of limitations. Plaintiff alleges the 1976 Agreement between Pizza Hut, Inc. (PHI) and Pizza Management, Inc. (PMI) was consummated as part of the negotiations which surrounded Arturo Torres' (Torres) assignment of PHI franchises to PMI on November 6, 1981. Plaintiffs allege the 1981 Blanket Amendment was a separate document dated July 20, 1981, and executed simultaneously with the execution of the superseding franchise agreement. From the face of the complaint, it appears the later agreement of the two, the 1981 Blanket Amendment, was executed on July 20, 1981. Plaintiffs filed their original complaint in this case on July 31, 1986, more than five years after the execution of the 1981 Blanket Amendment.

Plaintiffs' reformation count has two premises. One is legal and the other is factual. Plaintiffs recognize that the court's order of April 14, 1989, held that the 1976 Agreement and 1981 Blanket Amendment applied only to the franchise agreements respectively referenced in each of them, and that the two agreements, therefore, were not applicable to all franchise agreements actually held by PMI at the time of its proposed public offering. Plaintiffs next allege the parties' intent at the time of making both agreements was to the contrary. It was intended that PMI and Torres would be able to go public with whatever franchise agreements were owned by PMI whenever it was decided to go public. Plaintiffs seek to have the two written instruments reformed on the basis of mutual mistake.

■ The summary judgment order of April 14, 1989, has forced the plaintiffs to recast their arguments concerning the 1976 Agreement and the 1981 Blanket Amendment. Plaintiffs contended last year that their intent was unambiguously expressed in these same agreements. Now, they argue for the first time that the same language fails to convey their intent because of mutual mistake. Plaintiffs obviously hope this new claim will allow the court to consider the parol evidence supporting their interpretation of these agreements. Defendants move to dismiss the reformation count on the basis it is barred by the statute of limitations.

"Reformation is an ancient remedy used to reframe a written contract to reflect accurately the real agreement between the contracting parties when, either through mutual mistake or unilateral mistake coupled with actual or equitable fraud by the other party, the writing does not embody the contract as actually made." *Mutual of Omaha Insurance Company v. Russell,* 402 F.2d 339, 344 (10th Cir.1968), *cert. denied,* 394 U.S. 973, 89 S.Ct. 1456, 22 L.Ed.2d 753 (1969). Kansas courts apply the five-year statute of limitations under K.S.A. 60–511(5) to reformation claims. *Conner v. Koch Oil Co.,* 245 Kan. 250, 255, 777 P.2d 821 (1989); *Ferrell v. Ferrell,* 11 Kan.App.2d 228, 230–31, 719 P.2d 1, *rev. denied,* 239 Kan. 693 (1986). This statute "commences to run from the date the mistake is made." *Siegel v. Hackler, Administrator,* 181 Kan. 316, 318, 310 P.2d 914 (1957) (citing in part *Collins v. Richardson,* 168 Kan. 203, 209, 212 P.2d 302 (1949)); *see also Palmer v. The Land & Power Co.,* 180 Kan. 492, 500, 306 P.2d 152 (1957) (commences upon the date the deed was executed); *Regier v. Amerada Petroleum Corp.,* 139 Kan. 177, 183, 30 P.2d 136 (1934). To be timely, plaintiffs' reformation claim needed to be filed before July 21, 1986, it was not.

In defense, plaintiffs propound a novel, but entirely unsupported, interpretation of Kansas case law on when an action for reformation accrues. From the proposition that a written instrument is to be reformed to reflect the true agreement between the parties, plaintiffs assert that by analogy to breach of contract actions their reformation action did not accrue until the true, unwritten, agreement was breached by PHI's refusal to consent to the public offering in May of 1986. Not surprisingly, this novel approach is not validated by the

case law in Kansas, or for that matter any other jurisdiction. In fact, this breach of the true agreement proposal contradicts the express language previously quoted from the Kansas Supreme Court decisions of *Siegel* and *Collins.*

Reformation of an instrument is an equitable action primarily brought to rectify or reframe the instrument when it fails to express the real agreement. 66 Am.Jur. 2d at § 1. It is not brought primarily to recover for the breach of the true, real or intended agreement. Nothing prevents a party from bringing an action to reform once a mutual mistake has been made in recording the agreement in writing. When reformed, the written instrument relates back to the time of its original execution. *Conner,* 245 Kan. at 255, 777 P.2d 821. Breach of the real or true agreement may enable the parties to discover their mutual mistake in the written instrument, but it is only the making of the mistake which allows the party to bring an action to reform and which triggers the commencement of the five-year limitations period.

In the alternative, plaintiffs argue the defendants are estopped from raising the statute of limitations as a defense because they knew of plaintiffs' mistaken reading of the 1976 Agreement and 1981 Blanket Amendment, allowed plaintiffs to expand and invest in reliance upon that reading, and did nothing to inform plaintiffs of their mistaken reading. Plaintiffs refer to count XII of their second amended complaint as raising the factual basis to their estoppel theory. Waiting until their surreply memorandum to develop this theory, plaintiffs allege defendants, prior to this lawsuit, did not take the position that plaintiffs could not do an unrestricted public offering with those franchise agreements acquired after the 1976 Agreement and the 1981 Blanket Amendment. In particular, plaintiffs point to defendants' silence on this matter during the negotiation of the Texas Swap and the Bareclona agreements and in the letter from PHI's attorney, Mr. McClure, dated May 13, 1986.

As properly argued by defendants, equitable estoppel is not available unless there are allegations that they have done something, a representation or course of conduct, that amounts to an affirmative inducement to plaintiffs sufficient to delay their filing of the action. *Rex v. Warner,* 183 Kan. 763, 771, 332 P.2d 572 (1958); *Coffey v. Stephens,* 3 Kan.App.2d 596, 599, 599 P.2d 310 (1979). The estoppel doctrine is grounded on this rationale:

> If a defendant, electing to rely on the statute of limitations, has previously by deception or in violation of his duty toward plaintiff, caused him to subject his claim to the statutory bar, defendant must be charged with having wrongfully obtained an advantage which the court will not allow him to hold, and this can be done by his silence when under an affirmative duty to speak.

*Klepper v. Stover,* 193 Kan. 219, 222, 392 P.2d 957 (1964) (citations omitted). Equitable estoppel generally does not depend upon a party planning or intentionally contriving to lull the other into a false sense of security. Silence, coupled with material knowledge of facts not known by the other, may constitute estoppel when the silence has reasonably caused the other to refrain from actions that would have been taken had the facts been known. *Ferrell,* 11 Kan.App.2d at 234, 719 P.2d 1. The relationship between silence and the duty to speak, has been explained as follows:

> In general, a person is required to speak only when common honesty and fair dealing demand that he do so, and in order that a party may be estopped by silence, there must be on his part an intent to mislead, or at least a willingness that others should be deceived, together with knowledge or reason to suppose that someone is relying on such silence or inaction and in consequence thereof is acting or about to act as he would not act otherwise.

*Turon State Bank v. Bozarth,* 235 Kan. 786, 790, 684 P.2d 419 (1984).

The estoppel theory advanced by plaintiffs does not raise an issue which would entitle them to the opportunity of presenting those facts to the jury. This is not a case as in *Ferrell* where the plaintiff, not

knowing of the mistake, continued to perform pursuant to his understanding of their agreement and the defendant, knowing of the mistake, continued to allow plaintiffs' performance even though it was inconsistent with the terms of the written instrument. 11 Kan.App.2d at 234–36, 719 P.2d 1. Nor does this case resemble *Klepper* in which the mutual mistake was not known by either party and both acted for over eight years in a manner consistent with their true agreement instead of the written instruments. 193 Kan. at 219–20, 392 P.2d 957.

Defendants' alleged silence in the case *sub judice* was not over the fact of a mistake but was in regards to their own opinion on the proper meaning or construction of the 1976 Agreement and the 1981 Blanket Amendment. Silence concerning what is thought to be expressed in a negotiated written agreement is not the equivalent to silence over what is known to be a mistake. The significance of this distinction comes to light when placed against the fact in this case that plaintiffs never attempted to exercise their ostensible rights to a public offering any time during this purported period of defendants' silence. Plaintiffs were not exercising any rights allegedly provided under the 1976 Agreement and the 1981 Blanket Amendment when they acquired additional franchises. Unless defendants are legally obligated to disclose their opinion on a proper construction of these agreements, there is nothing in this case to show an affirmative inducement for plaintiffs to delay bringing their reformation action. For reasons addressed later in this order, the court can find no fiduciary duty on defendants to reveal their interpretation of the 1976 Agreement and the 1981 Blanket Amendment prior to plaintiffs' attempted public offering under them.

Furthermore, even assuming improper silence or affirmative action, plaintiffs have not alleged facts showing that they would have brought the reformation action had they known of defendants' interpretation. Prior to filing their second amended complaint, plaintiffs were satisfied that, despite defendants' asserted interpretations to the contrary, the 1976 Agreement and the 1981 Blanket Amendment unambiguously expressed and protected their rights to an unqualified public offering. Only after the court granted partial summary judgment against them did plaintiffs allege mutual mistake and seek reformation. The court grants defendants' motion to dismiss count II of plaintiffs' second amended complaint.

## COUNT IV—TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE

Plaintiffs here allege that on May 2, 1986, they notified defendants of their intention to do a public offering in accordance with the terms of the 1976 Agreement, the 1981 Blanket Amendment, and the Barcelona Agreement and that defendants refused to abide by those agreements. By not giving an unqualified consent to the public offering, defendants are also alleged to have breached their duty to not unreasonably withhold their consent to transfers of interest. Plaintiffs further assert that defendants' actions are an attempt "to inhibit and prevent PMI from using its stock to purchase additional franchise territories and to compete against PHI." (Dk. 385, ¶ 42). Plaintiffs allege these wrongful actions are without justification and have adversely affected their business and future growth.

Defendants attack this count as nothing more than a repleading of plaintiffs' breach of contract action without any allegations of an independent tort. Defendants primarily contend that a tort claim cannot be based upon the breach of only contractual duties and that plaintiffs cannot recover punitive damages in their contract action without asserting an additional injury resulting from the alleged tortious conduct.

Over the span of some twenty pages, plaintiffs respond in a number of ways. They construe defendants' argument to be that the element of intentional misconduct must constitute an independent tort, and they then cite case law refuting this position. Plaintiffs, however, do not directly confront the defendants' other argument

on the requirement of an additional injury before recovering punitive damages on a contract-based claim.

The elements of tortious interference with prospective business advantage are found in *Turner v. Halliburton Co.*, 240 Kan. 1, 12, 722 P.2d 1106 (1986):

(1) the existence of a business relationship or expectancy with the probability of future economic benefit to the plaintiff; (2) knowledge of the relationship or expectancy by the defendant; (3) that, except for the conduct of the defendant, plaintiff was reasonably certain to have continued the relationship or realized the expectancy; (4) intentional misconduct by defendant; and (5) damages suffered by plaintiff as a direct or proximate result of defendant's misconduct.

(citing *Maxwell v. Southwest Nat. Bank, Wichita, Kan.*, 593 F.Supp. 250, 253 (D.Kan.1984)). This tort is predicated on improper or malicious conduct by the defendant. *Turner*, 240 Kan. at 12, 722 P.2d 1106. Malice is intentional interference without justification. *Reazin v. Blue Cross & Blue Shield of Kansas, Inc.*, 663 F.Supp. 1360, 1492 (D.Kan.1987), *aff'd*, 899 F.2d 951 (10th Cir.1990). The Kansas Supreme Court in *Turner* also adopted the factors listed in the Restatement (Second) of Torts 767 for evaluating whether a defendant's conduct in interfering with the prospective business advantage was improper or not:

(a) the nature of the actor's conduct,

(b) the actor's motive,

(c) the interests of the other with which the actor's conduct interferes,

(d) The interests sought to be advanced by the actor,

(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,

(f) the proximity or remoteness of the actor's conduct to the interference, and

(g) the relations between the parties.

*Id.* 240 Kan. at 14, 722 P.2d 1106. This tort is actionable when there has been interference with a party's prospective business relationship with a third person. A defendants' "interference" with the prospective business relationship between it and the plaintiff is not actionable under this tort theory. See *Noller v. General Motors Corp.*, 244 Kan. 612, 620, 772 P.2d 271 (1989).

■ The first issue here is whether a party's breach of a contract can also serve as the predicate of intentional misconduct for purposes of the tort of interference with prospective business advantage. In defendants' view, if it is sufficient under this tort to allege that, as a consequence of the contract breach, certain other business relationships have been tortiously interfered with, then it is difficult to imagine a breach of contract case that would not also have a companion tort claim. This prediction is flawed because the mere allegation of a contract breach is not enough to assert a tortious interference claim.

Interference with the prospective business advantage must be intentional, that is, the defendant must desire the resulting interference or knows it is substantially certain to occur. Restatement (Second) of Torts § 766B comment d (1977). The interference must also be improper under the factors outlined in Restatement (Second) of Tort § 767. The purpose or motive of the alleged tortfeasor is significant. *Turner*, 240 Kan. at 14, 722 P.2d 1106. If the interference is an expected incidental effect of certain actions taken for another reason, then the interference may not be improper. Restatement (Second) of Torts § 766B comment d. To plead an action for tortious interference with prospective business advantage, a plaintiff must allege more than an intentional breach of a contractual duty; each of the elements—business relationship, defendant's knowledge of same, and causation—must also be pleaded. When the asserted misconduct is the breach of an existing contract between the parties, the court believes it appropriate to require the plaintiff to allege in addition that the breach was committed upon the motive of interfering with the prospective business relationships of the plaintiff and third parties. These requirements appear conso-

nant with the law in Kansas and other jurisdictions.

In *Noller*, plaintiff, the prospective purchaser of a truck dealership, sued the truck manufacturer, and franchisor, General Motors Corporation (GMC), for refusing to grant him the franchise on that dealership. Plaintiff had made GMC's consent a condition to his purchase of the dealership. 244 Kan. at 615–16, 772 P.2d 271. Noller claimed GMC was liable for breach of contract, tortious interference with contract, and tortious interference with prospective business advantage. The Kansas Supreme Court affirmed the order of summary judgment in favor of GMC on all claims, agreeing that plaintiff was an incidental, not an intended, beneficiary; that Noller voluntarily terminated his dealership purchase agreement; and that defendant did not interfere with a prospective business relationship. 244 Kan. at 617–20, 772 P.2d 271. On this last claim, Noller argued on appeal that his expected business advantage was with the seller of the dealership and future GMC truck purchasers. 244 Kan. at 620, 772 P.2d 271. The Kansas Supreme Court considered neither circumstance to be actionable since plaintiff voluntarily ended the purchase agreement and was only an incidental beneficiary to GMC's franchise agreement with the seller. *Id.* It reasonably follows from this case that had he been an intended beneficiary of the dealership agreement, plaintiff would have been able to sue for both breach of contract and tortious interference with prospective business advantage. *See Noller v. General Motors Corp.*, 13 Kan.App.2d 13, 27–29, 760 P.2d 688 (1988), *aff'd in part and rev'd in part*, 244 Kan. 612, 772 P.2d 271 (1989).

Applying Kansas law, the Missouri Court of Appeals addressed the recoverability of punitive damages on a claim for tortious interference when the same actionable conduct is also pleaded as a claim for breach of contract. *Garrett v. American Family Mutual Ins. Co.*, 520 S.W.2d 102 (1975). The court acknowledged that the general rule in Kansas, as in other jurisdictions, was for punitive damages to be unavailable in a breach of contract action absent an independent tort. The Missouri court re-

jected the notion that the independent tort must be occasioned by conduct different from that alleged for the contract action. 520 S.W.2d at 120–21. This same approach is followed in New York. *S & S Hotel Ventures, Ltd. v. 777 S.H. Corp.*, 108 A.D.2d 351, 489 N.Y.S.2d 478 (A.D. 1st Dept.1985). Kansas law allows a claim for tortious interference with prospective business advantage even when the alleged predicate act of misconduct is a defendant's breach of a contract.

The next issue raised by defendants is whether Kansas law allows for the recovery of punitive damages when the alleged independent tort is a contract-based claim that does not cause any injury additional to the underlying breach of contract claim. The general rule in Kansas in a breach of contract action is to permit the recovery of only pecuniary losses and to disallow punitive damages in the absence of an independent tort. *Guarantee Abstract & Title Co. v. Interstate Fire & Cas. Co.*, 232 Kan. 76, 78, 652 P.2d 665 (1982). An exception is "recognized when some independent tort or wrong results in *additional injury* which justifies assessment of punitive damages by way of punishment of the wrongdoer." *Id.* (emphasis supplied). This independent tort must be proved by the presence of "malice, fraud or wanton disregard for the rights of others." *Id.* The Kansas Supreme Court has held that when all of the damages flow directly from the breach of the contractual duty, the alleged independent tort would not justify an award of punitive damages. *Id.*

The Tenth Circuit has recently clarified the importance of this additional injury requirement in Kansas law. In *Osgood v. State Farm Mut. Auto. Ins. Co.*, 848 F.2d 141 (10th Cir.1988), plaintiff, administratrix of the estate, brought an action against the decedents' liability insurance company to recover under the underinsured motorist policy. In count two, plaintiff alleged that representatives of the insurance company, in order to induce a settlement of the claims, had made fraudulent misrepresentations regarding the limits of the underinsured motorist coverage. Plaintiff appeal-

ed the district court's grant of partial summary judgment on count two. The Tenth Circuit first found that Kansas law does not have a per se bar on fraud actions against insurance companies. Next, the circuit court reiterated that "Kansas law only permits punitive damages in contract actions when (1) there is some independent tort amounting to fraud or wanton conduct, and (2) the independent tort results in additional injury." 848 F.2d at 144. One of the Kansas decisions cited by the Tenth Circuit is *Cornwell v. Jespersen*, 238 Kan. 110, 120, 708 P.2d 515 (1985), where it is stated: "breach of a contract, standing alone, does not call for punitive damages even if the breach is intentional and unjustified." The Tenth Circuit found that plaintiff was barred from seeking punitive damages as she had failed to allege any additional damages in the fraud claim. 848 F.2d at 144–46.

Count IV of plaintiffs' second amended complaint must be dismissed for failure to allege any injuries beyond those asserted in their breach of contract claim. All injuries alleged in Count IV flowed directly from PHI's failure to give an unqualified consent to PMI's attempt to go public. This same conduct and injuries are alleged in count I where plaintiffs claim breaches of the 1976 Agreement, the 1981 Blanket Amendment, the Barcelona Agreement, and other franchise agreements. There is nothing alleged in count IV to suggest any injuries in addition to those pleaded in count I. The mere difference in the amount of damages requested in counts I and IV does not satisfy the requirement of pleading an additional injury unless some factual or legal basis is also pleaded to explain the larger request made in count IV. This court realizes this requirement may in most instances preclude an action for tortious interference with prospective business advantage where the alleged predicate act of misconduct is the breach of the contract between the parties. Nevertheless, the court has no reason, and has not been presented with any, for creating an exception to established Kansas law under these circumstances.

Nor can this court indulge plaintiffs by reading count IV as also alleging that defendants' misconduct constitutes the tort of unfair competition. The only unlawful or illegal actions of defendants alleged in count IV are the breaches of certain contracts. The allegations of motives singularly notify the reader that defendants breached these agreements with the intent to interfere with plaintiffs' business advantage. No one is alerted that plaintiffs are also claiming that the same conduct is actionable as unfair competition. A complaint is not amended by a brief in opposition to the motion to dismiss. *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir.1984), *cert. denied*, 470 U.S. 1054, 105 S.Ct. 1758, 84 L.Ed.2d 821 (1985). Defendants' motion to dismiss count IV is granted.

## COUNT V—TORTIOUS INTERFERENCE WITH CONTRACT

Plaintiffs here allege that PMI in May of 1986 negotiated with John D. Finerty (Finerty) to acquire his outstanding stock in Restaurant Associates S.A., the "Pizza Hut" franchisee in Spain. "[A]n agreement was reached whereby PMI would purchase from Finerty and others all of the outstanding stock of Restaurant Associates S.A." (Dk. 385, ¶ 44). Plaintiffs allege that verbal approval from PepsiCo was obtained before the acquisition agreements were executed and that in reliance upon this approval they closed the purchase with Finerty and took over management of the franchise. PMI asserts it sought, during the closing of the stock transaction, written confirmation of the prior verbal approval, but PepsiCo denied the request. PMI seeks relief on the theories that this denial of formal written confirmation of consent constitutes "interference with the contract between PMI and Finerty" and that PMI is estopped from withholding this written confirmation. Only the claim of tortious interference is at issue in the motion to dismiss.

Defendants contend these allegations are deficient because they do not allege that PepsiCo caused or induced Finerty to not perform or that Finerty actually failed or refused to perform. This court set forth

the elements of the tort of interference with contract in its order of April 14, 1989. (Dk. 333 at 33–34). There the court stated it was necessary to allege that the tortfeasor caused the third party to *breach* its contract with the claimant and cited for authority Judge Kelly's decision in *Reazin*, 663 F.Supp. at 1491.

■ As pleaded, count V states a claim for tortious interference with a contract and not a prospective business advantage. Plaintiffs allege PepsiCo's refusal to give a written confirmation to consent interfered with Finerty's completion of his end of the stock transfer under the existing contract to sale. The tort of interference with prospective business advantage is concerned only with those relations not yet reduced to contract. *Pizza Management, Inc., et al. v. Pizza Hut, Inc., et al.*, No. 86–1664–C at 34, 1989 WL 46253 (D.Kan. April 14, 1989). Notwithstanding their opinions to the contrary, plaintiffs do not plead a tort of interference with prospective business advantage in count V.

■ Plaintiffs admit that Finerty did not breach his contract with PMI but contend that PepsiCo's refusal to consent damaged PMI by interfering with Finerty's performance. Once more, the court refers back to its order of April 14, 1989, where it dismissed PHI's claim against PMI for tortious interference with its agreements with other franchisees. Citing *George A. Fuller Co. v. Chicago Col. of Ost. Med.*, 719 F.2d 1326, 1330 n. 1, 1331 (7th Cir.1983), this court held: "[a]bsent persuasive indicia that the Kansas Supreme Court would extend an action of interference with contract to any adverse impact or increased burden, short of a breach, this court will not do so." (Dk. 333 at 35). Plaintiffs' citation of *Taylor v. Local Union 101*, 189 Kan. 137, 139, 368 P.2d 8 (1962), is not persuasive indicia, since the ambiguity of the phrase, "contractual rights," is cleared up by the fact that Taylor's employment contract was actually terminated. 189 Kan. at 138–39, 368 P.2d 8. For these reasons, defendants' motion to dismiss the tortious interference with contract claim in count V is granted.

## COUNT VI—CIVIL CONSPIRACY

Plaintiffs allege PHI and PepsiCo have conspired to coerce PMI to relinquish its rights in the 1976 Agreement, the 1981 Blanket Amendment, the Barcelona Agreement and the superseding franchise agreements (SFAs) and to achieve their object of forcing PMI's present stockholders to retain control of PMI upon a public offering. In furtherance of their object, defendants are alleged to have wrongfully interfered in the contract between PMI and Finerty; threatened to terminate their franchise relationship with PMI; and also refused to consider plaintiffs as being qualified to acquire additional "Pizza Hut" territories, to renew plaintiffs' franchises in Puerto Rico and the Virgin Islands, to consent to plaintiffs' acquisition of corporations owned by Blankenship, and to credit PMI for its development of delivery services.

■ Defendants contend the allegations in Count VI fail for several reasons to state a sufficient claim for civil conspiracy. First, plaintiffs have not asserted an underlying object that is actionable. Second, a parent corporation cannot conspire with its wholly-owned subsidiary corporation for purposes of liability on a claim of civil conspiracy. Finally, a party cannot be held liable conspiring to breach its own contract.

The elements of a civil conspiracy are:

(1) two or more persons;

(2) an object to be accomplished;

(3) a meeting of the minds in the object or course of action;

(4) one or more unlawful overt acts; and

(5) damages as the proximate result thereof.

*Stoldt v. City of Toronto*, 234 Kan. 957, 967, 678 P.2d 153 (1984) (quoting *Citizens State Bank v. Gilmore*, 226 Kan. 662, Syl. ¶ 7, 603 P.2d 605 (1979). "Conspiracy is not actionable without commission of some wrong giving rise to a cause of action independent of the conspiracy." *Stoldt*, 234 Kan. at 967, 678 P.2d 153. The unlawful overt acts must also produce an unlawful result. *Id.* at 967–68, 678 P.2d 153.

The essence of a conspiracy is two or more persons agreeing in some form and acting on a desire "to bring about an illegal result." *Intern. U., United Auto., Etc. v. Cardwell Mfg. Co.*, 416 F.Supp. 1267, 1290 (D.Kan.1976). Kansas courts have recognized a conspiracy "to procure or induce a breach of contract." *Cardwell Mfg. Co.*, 416 F.Supp. at 1290; *see also Beverly v. McCullick*, 211 Kan. 87, 99, 505 P.2d 624 (1974). Stated another way, a party may be sued for conspiring with a third party who has induced him to breach his contract. *Laser Industries, Ltd. v. Eder Instrument Co.*, 573 F.Supp. 987, 993 (N.D. Ill.1983); *see also Cardwell Mfg. Co.*, 416 F.Supp. at 1284–1285, 1289–91; *Beverly v. McCullick*, 211 Kan. at 98–99, 505 P.2d 624 (liability upheld against partners for conspiring with other parties to breach their partnership agreement and fiduciary duties therein). *See also May v. Santa Fe Trail Transportation Co.*, 189 Kan. 419, 424–25, 370 P.2d 390 (1962).

The court finds that count VI adequately alleges the unlawful object of the conspiracy—defendants agreed to breach their respective contracts with PMI and to deny plaintiffs' their contractual rights to go public without any restrictions. In paragraph forty-nine of the second amended complaint, plaintiffs delineate the alleged unlawful overt acts. PMI alleges the conspiracy caused it "economic and irreparable damage." Defendants' first and last contentions against count VI are, therefore, denied.

Defendants also seek to dismiss this count as it does not allege an agreement between two or more persons. Upon the force of the rationale stated in *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), defendants request the court to find as a matter of law that PepsiCo, the parent corporation, and PHI, its wholly owned subsidiary corporation, cannot civilly conspire. The Supreme Court held in *Copperweld* that for purposes of § 1 liability under the Sherman Act the activity of a parent corporation and its wholly owned subsidiary must be considered as that taken by a single enterprise. The Court reasoned:

A parent and its wholly owned subsidiary have a complete unity of interest. Their objectives are common, not disparate; their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one. They are not unlike a multiple team of horses drawing a vehicle under the control of a single driver. With or without a formal "agreement," the subsidiary acts for the benefit of the parent, its sole shareholder. If a parent and a wholly owned subsidiary do "agree" to a course of action, there is no sudden joining of economic resources that had previously served different interests, and there is no justification § 1 scrutiny.

467 U.S. at 771, 104 S.Ct. at 2741–42. Plaintiffs argue the *Copperweld* decision is narrowly based upon a legislative policy underlying § 1 liability of the Sherman Act which would compel the finding of an antitrust violation by the very fact of the inherent relationship between the parent and its wholly owned subsidiary. Plaintiffs also point to decisions which have refused to apply the above rationale to other legal claims of conspiracy, *Ashland Oil, Inc. v. Arnett*, 875 F.2d 1271, 1280–81 (7th Cir. 1989) (Intracorporate conspiracies may not threaten antitrust laws, but they do "threaten RICO's goals of preventing the infiltration of legitimate businesses by racketeers"), *Metro. Life Ins. Co. v. LA Mansion Hotels*, 762 S.W.2d 646 (Tex.Ct. App.1988) (Holding in *Copperweld* is "irrelevant" to an alleged conspiracy under common law theories).

In reply, defendants cite several decisions that have extended the *Copperweld* rationale beyond the Sherman Act, *SI Handling Systems, Inc. v. Heisley*, 658 F.Supp. 362, 370 (E.D.Pa.1986) (*Copperweld* rationale is authority for concluding parent owns a trade secret acquired by a subsidiary); *Laxalt v. McClatchy*, 622 F.Supp. 737, 745–46 (D.Nev.1985) (wholly owned subsidiaries have no separate legal existence for civil conspiracy claims) (citing *Corbit v. J.I. Case Co.*, 70 Wash.2d 522, 424 P.2d 290 (1967)); *In re Ray Dobbins Lincoln–Mercury, Inc.*, 604 F.Supp. 203, 204–

05 (W.D.Va.1984) (*Copperweld* logic controls conspiracy claim under Virginia statute despite any distinction between Sherman Act and state statute), *aff'd*, 813 F.2d 402 (4th Cir.1986); *Ford Motor Co. v. Lyons*, 137 Wis.2d 397, 405 N.W.2d 354 (1987) (*Copperweld* rule applies to state statutory action for conspiracy to injure another's reputation, trade, business or profession, because the economic policy underlying this action is similar to the Sherman Act); *In re: Asbestos Litigation*, 509 A.2d 1116 (Del.Super.Ct.1986) (*Copperweld*, was cited as authority for holding that a parent corporation cannot conspire with its subsidiary for purposes of civil conspiracy liability), *aff'd*, 525 A.2d 146 (Del.1987). Even without the cogent reasoning of the Supreme Court in *Copperweld*, courts have rejected the possibility of a parent corporation tortiously conspiring with its wholly owned subsidiary. *Bryant Heating & Air Conditioning v. Carrier Corp.*, 597 F.Supp. 1045, 1054 (S.D.Fla. 1984) (citing *Buckner v. Lower Florida Keys Hospital District*, 403 So.2d 1025, 1029 (Fla.Dist.Ct.App.1981)); *Bunch v. Artec Intern. Corp.*, 559 F.Supp. 961, 970 (S.D.N.Y.1983) (noting this to be the rule in both Pennsylvania and Oregon and citing in part *Galego v. Knudsen*, 282 Or. 155, 578 P.2d 769 (1978)).

In 1976 another court in this district found a civil conspiracy between a parent corporation and its wholly owned subsidiary. *Cardwell Mfg. Co.*, 416 F.Supp. at 1285–1291. Nowhere in that decision is the issue involved here ever raised or confronted. In fact, the importance of this ruling is diminished since the court had already imposed liability on the parent after piercing the corporate veil of the subsidiary. In spite of this decision, the court is persuaded to follow the reasoning and weight of the case law cited by defendants.

The rationale in *Copperweld* is compelling enough to justify its extension to the tort of conspiracy as pleaded in this case. A conspiracy, by itself, is not actionable; there must be harm or injuries resulting from it and from conduct independently actionable. Where the alleged harm and motives are mostly economic in nature and the overt acts primarily attributable to the wholly owned subsidiary, a civil conspiracy claim in almost all circumstances would also exist against the parent corporation. By the very nature of their relationship, the parent corporation and its wholly owned subsidiary have shared goals, particularly economic ones, since "the subsidiary acts for the benefit of the parent, its sole shareholder." *Copperweld*, 467 U.S. at 771, 104 S.Ct. at 2742. If a civil conspiracy claim was actionable under these circumstances, the stricter burdens governing the alter ego doctrine and the policy value reflected in those burdens would be readily circumvented. The alleged actions of PHI are undeniably the result of the one consciousness guiding the economic decisions of both PepsiCo and PHI. For all of these reasons, PepsiCo should not be held liable under a civil conspiracy theory for PHI's actions. Defendants' motion to dismiss count VI is granted.

## COUNT X—BREACH OF CONTRACT AND BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING

Plaintiffs here allege PHI promised its franchisees, including PMI, to rebate certain fees on all new delivery-only units constructed or on all existing restaurants remodeled to provide delivery service. Relying on this promise, PMI changed its restaurants and constructed new delivery-only units, but PHI has "arbitrarily, wrongfully and recklessly" refused to rebate these fees to plaintiffs in violation of its duty of good faith and fair dealing. Plaintiffs pray to recover both actual and punitive damages on this count.

Defendants seek to have plaintiffs' punitive damage claim, as well as plaintiff Torres, dismissed from this count. Defendants' argument is simply that the breach of the duty of good faith and fair dealing is a contract action for which punitive damages are not recoverable and that plaintiff Torres is not a party to those agreements. Plaintiffs attempt to skirt the first contention by referring to their breach of fiduciary duty claim alleged in count IX and the propriety of seeking punitive damages for

such a claim. If plaintiffs' logic were carried to its proper conclusion, breach of contract claims and breach of fiduciary duty claims would become indistinguishable. Plaintiffs also argue the allegations of count X are sufficient to state an action for fraud and misrepresentation. Count X asserts only a breach of the duty of good faith and fair dealing under the alleged facts and nothing more.

■ Plaintiffs next argue a dearth of Kansas case law on the issue of whether the breach of the duty of good faith is an action in tort or contract. On January 17, 1990, this court held in *Ritchie Enterprises v. Honeywell Bull, Inc.*, 730 F.Supp. 1041, 1052 (D.Kan.1990), that a tort for breach of the implied covenant of good faith and fair dealing would not be recognized in a commercial contract setting. The court therein cited two unpublished decisions, one from the Kansas Court of Appeals and the other from the Kansas Supreme Court, as an indication of the Kansas appellate courts' position on the issue. Neither of the decisions cited by plaintiffs, *Atkinson v. Orkin Exterminating Co.*, 5 Kan.App.2d 739, 745, 625 P.2d 505, *aff'd*, 230 Kan. 277, 634 P.2d 1071 (1981), *Yeager v. National Cooperative Refinery Ass'n*, 205 Kan. 504, 509, 470 P.2d 797 (1970), suggests that a breach of the duty of good faith is a tort in Kansas. This duty is implied in a contract, and conduct departing from that duty is a breach of a contractual obligation. *See Bonanza, Inc. v. McLean*, 242 Kan. 209, 222, 747 P.2d 792 (1987). Defendants' motion to dismiss the punitive damages claim and plaintiff Torres from count X is granted.

### COUNT XII—PROMISSORY ESTOPPEL/EQUITABLE ESTOPPEL

In this count, plaintiffs begin by alleging that PepsiCo, Productos PepsiCo, S.A, and PHI entered into the 1984 Barcelona Agreement, which has as one of its terms the same operative language found in the 1976 Agreement and the 1981 Blanket Amendment. This provision purportedly gives PMI and Torres rights which, because of PHI's guarantee, are not restricted or linked to any territorial limitation. Plaintiffs believe this term of the 1984 Barcelona Agreement is still enforceable and claim that defendants are estopped from denying its validity and enforceability. Plaintiffs allege they relied on these agreements and invested and expanded their operation all with the knowledge, consent or encouragement of the defendants. Plaintiffs assert damages flowing from defendants' refusal to allow a public offering, "withholding consent in various matters and threatening to or attempting to terminate PMI's franchises." (Dk. 385, ¶ 74).

Labelling this the "kitchen sink" count, defendants attack it on three fronts. Equitable estoppel is not a theory upon which affirmative relief is available. Promissory estoppel operates where the promise is gratuitous, rather than contractual. Lastly, punitive damages are not recoverable on a promissory estoppel theory. Plaintiffs do not refute the first attack and concede the last one. Plaintiffs believe they have alleged in this count a claim for promissory estoppel, fraud, and misrepresentation. The court again blocks plaintiffs' attempt to transform their pleaded claims into something they are not. Whether or not some of the allegations may also satisfy several of the elements of a fraud action, the pleading in count XII, read in the most liberal light, does not provide notice of a fraud claim.

■ Promissory estoppel is an alternative theory of recovery to a breach of contract claim. It is an equitable doctrine resorted to for the enforcement of promises that are noncontractual and otherwise unenforceable. *See Glasscock v. Wilson Constructors, Inc.*, 627 F.2d 1065, 1067 (10th Cir.1980). Where proof of an express contract fails on one or more of the essential elements, such as consideration, and where refusal to enforce a party's promise would be unjust because of reliance upon it, promissory estoppel is the appropriate theory for recovery. *Federal Ins. Co. v. Thomas W. Perry, Inc.*, 634 F.Supp. 349, 352–53 (D.D.C.1986). For this theory to be invoked as a substitute for consideration, the evidence must establish: "(1) The prom-

isor reasonably expected the promisee to act in reliance on the promise, (2) the promisee acted as could reasonably be expected in relying on the promise, and (3) a refusal of the court to enforce the promise would sanction the perpetration of fraud or result in other injustice." *Mohr v. State Bank of Stanley,* 244 Kan. 555, 574, 770 P.2d 466 (1989) (citing *Berryman v. Kmoch,* 221 Kan. 304, 307, 559 P.2d 790 (1977)). The critical feature of promissory estoppel is that the representation causing reliance is a promise instead of a statement of fact. *Marker v. Preferred Fire Ins. Co.,* 211 Kan. 427, ¶ 3, 506 P.2d 1163 (1973).

 In count XII, plaintiffs allege defendants' promises are contained in the pertinent provisions of the Barcelona Agreement, the 1976 Agreement, and the 1981 Blanket Amendment. In ¶ 72, plaintiffs even contend the promises under the Barcelona Agreement are still binding upon the parties. Plaintiffs seek to have defendants estopped from denying the enforceability of the promises set forth in those agreements. Plaintiffs have not properly pleaded a promissory estoppel claim. Plaintiffs do not allege reliance upon promises found in unenforceable contracts or upon promises not found in enforceable contracts. "Promissory estoppel is ... applicable only in the absence of an otherwise enforceable contract." *Gilmore v. Ute City Mortg. Co.,* 660 F.Supp. 437, 439–40 (D.Colo.1986). *See also Walker v. KFC Corp,* 728 F.2d 1215, 1218–20 (9th Cir.1984). Plaintiffs, instead, base their promissory estoppel claim on promises said to already exist in enforceable agreements. Because they assert reliance upon promises allegedly expressed in viable agreements, plaintiffs' promissory estoppel claim is necessarily duplicative of their breach of contract claims. *Paretti v. Cavalier Label Co., Inc.,* 702 F.Supp. 81, 85 (S.D.N.Y.1988). Defendants' motion to dismiss count XII is granted.

## MOTION FOR SUMMARY JUDGMENT

Defendants move for summary judgment in the favor of PepsiCo on counts I, II, VII, VIII, IX and XII and in the favor of both defendants on counts I, II, V, and IX of the second amended complaint. To the extent their motion for summary judgment overlaps certain counts and claims challenged in their motion to dismiss, defendants explain the arguments in support of summary judgment are brought in the alternative. Plaintiffs vigorously oppose the motion.

In ruling on a motion for summary judgment, the trial court conducts a threshold inquiry of the need for a trial. Without weighing the evidence or determining credibility, the court grants summary judgment when no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–252, 106 S.Ct. at 2511–12.

 An issue of fact is "genuine" if the evidence is significantly probative or more than merely colorable such that a jury could reasonably return a verdict for the nonmoving party. *Id.* at 248, 106 S.Ct. at 2509. An issue of fact is "material" if proof thereof might affect the outcome of the lawsuit as assessed from the controlling substantive law. 477 U.S. at 249, 106 S.Ct. at 2510. Factual inferences are drawn to favor the existence of triable issues, and where reasonable minds could ultimately reach different conclusions, summary judgment is inappropriate. *See Riley v. Brown & Root, Inc.,* 896 F.2d 474, 476–77 (10th Cir.1990).

The movant's initial burden under Fed.R. Civ.P. 56 is to show the absence of evidence to support the nonmoving party's case. *Windon Third Oil and Gas v. Federal Deposit Ins.,* 805 F.2d 342, 345 (10th Cir. 1986), *cert. denied,* 480 U.S. 947, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987). The movant must specify those portions of " 'the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits if any,' " which demonstrate the

absence of a genuine issue of fact. *Windon*, 805 F.2d at 345 (quoting Fed.R.Civ.P. 56(c)). It may be sufficient for the movant to establish that the alleged factual issues are without legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir.1987).

The opposing party may not rest upon mere allegations or denials in the pleadings but must set forth specific facts supported by the kinds of evidentiary materials listed in Rule 56(c). *Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511. The nonmoving party's evidence is deemed true and all reasonable inferences are drawn in his favor. *Windon*, 805 F.2d at 346. More than a "disfavored procedural shortcut," summary judgment is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.' Fed.R. Civ.P. 1." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986).

Before going to the statement of uncontroverted facts, a procedural issue must be resolved. Plaintiffs contend defendants' motion should be summarily dismissed because discovery relative to the new issues and claims in their second amended complaint is ongoing. Defendants rebut this contention in explaining that their motion is almost entirely based upon this court's prior rulings, the plaintiffs' prior admissions, and the express language of the written agreements. Defendants question the materiality of any matters not yet discovered and aptly point out that plaintiffs have failed to comply with Fed.R.Civ.P. 56(f).

Rule 56 does not require that summary judgment motions be entertained and decided only after discovery is complete. *Weir v. Anaconda Co.*, 773 F.2d 1073, 1081 (10th Cir.1985); *Gray v. Udevitz*, 656 F.2d 588, 592 (10th Cir.1981). Such a requirement would frustrate the usefulness of summary judgment as a tool to weed out claims that are frivolous or unattended by material issues of fact. *Gray*, 656 F.2d at 592. Rule 56(f) does offer protection from summary judgment where the nonmoving party has not had an adequate opportunity to discover the facts crit-

ical to preparing his opposition. *Anderson*, 477 U.S. at 250 n. 5, 106 S.Ct. at 2511 n. 5. This protection is afforded "only if the nonmoving party files an affidavit explaining why he or she cannot present facts to oppose the motion." *Dreiling v. Peugeot Motors of America, Inc.*, 850 F.2d 1373, 1376 (10th Cir.1988) (citing *Weir*, 773 F.2d at 1082). When a party fails to file a Rule 56(f) affidavit and, thereby, trigger its protection, the court does not abuse its discretion in granting summary judgment if otherwise appropriate. *Dreiling*, 850 F.2d at 1376–77. An affidavit is not sufficient unless the affiant shows how a continuance would provide the facts necessary to rebut the allegations of no genuine issue of material fact. *Weir*, 773 F.2d at 1083.

Plaintiffs have not filed a 56(f) affidavit and, therefore, are not entitled to its shelter. Even assuming plaintiffs had filed such an affidavit along the lines of their brief, they have failed to show why additional time would produce facts material to the issues of the instant motion. Plaintiffs request for dismissal of defendants' motion as premature is denied.

Defendants statement of uncontroverted facts comprises thirty-six paragraphs. Plaintiffs respond to each paragraph and then offer their own one hundred and thirty-six paragraphs of uncontroverted facts. In large part, plaintiffs' own statement of facts is wholly immaterial to the issues raised by this motion, and those facts which are relevant will either be referenced in the court's statement of uncontroverted facts or in its legal discussion of the issues.

For purposes of the defendants' motion for summary judgment, the court considers the following facts to be uncontroverted:

1. Defendant PHI, a wholly owned subsidiary of defendant PepsiCo, owns all "Pizza Hut" trademarks and the right to franchise those trademarks to others.

2. Plaintiff PMI is a privately-owned Texas corporation and a franchisee of PHI under certain franchise agreements. PMI has not been registered under the Securities Exchange Act of 1934 at any relevant time. Plaintiff Torres is the president of

PMI and owns at least 60% of PMI's outstanding common stock.

3. As of November, 1976, PMI was, or soon was to become, the operator under twenty-six franchise agreements with PHI. On or about November 6, 1976, PHI and PMI executed the 1976 Agreement which referenced the twenty-six franchise agreements that were contemporaneously assigned to PMI.

4. On April 14, 1989, this court found the pertinent provisions of the 1976 Agreement unambiguous and construed them as a matter of law to be a modification or amendment applicable only to the twenty-six franchise agreements listed therein. (Dk. 333, pp. 24–28).

5. In 1981, PHI adopted a new form of franchise agreement, known as the Superseding Franchise Agreement (SFA), to replace the existing franchise agreements with its domestic franchisees. Concerning their effectiveness upon execution, the SFAs contain the following recitals and provision:

> WHEREAS, the parties hereto have previously been parties to a Pizza Hut, Inc. Franchise Agreement governing the System business conducted by Operator within the same geographical territory as hereinafter specified;
>
> WHEREAS, the parties hereto mutually desire to supersede such prior Agreement, and amendments thereto, if any, with this Superseding Franchise Agreement in order to satisfactorily redefine their respective rights and obligations;
>
> . . . .
>
> The Pizza Hut, Inc. Franchise Agreement and amendments thereto, if any, previously executed by Operator with respect to the Pizza Hut restaurants franchised thereunder and to the geographical territory described in Article I.A. are superseded by this Agreement and shall have absolutely no further force or effect whatsoever.

6. On July 20, 1981, PMI and PHI entered into twenty-six SFAs which covered the same or expanded versions of the franchise territories which were covered by twenty-five of the twenty-six franchise agreements referenced in the 1976 Agreement.

7. The only franchise agreement that was held by PMI on July 20, 1981, that was described in the 1976 Agreement and that was not superseded by an SFA executed on July 20, 1981, is the franchise agreement covering Puerto Rico. (Plaintiffs' citations do not controvert the fact that the SFAs superseded twenty-five of the twenty-six franchise agreements executed in 1976.)

8. On July 20, 1981, PMI, PHI and Torres executed the 1981 Blanket Amendment. The twenty-six SFAs were listed on an exhibit to the 1981 Blanket Amendment.

9. On April 14, 1989, this court found the pertinent provisions of the 1981 Blanket Amendment unambiguous and construed them as a matter of law to be a modification or amendment applicable only to the twenty-six franchise agreements listed therein.

10. After PMI's execution of the 1981 SFAs and the 1981 Blanket Amendment, it took assignments on the following additional franchise agreements:

A. On or about March 18, 1982, the SFA covering Orange County, California, excluding the City of La Habra (Orange County SFA), was assigned by the franchisee thereunder, Quinn–Star Enterprises, to PMI.

B. On or about July 14, 1982, the SFA covering the City of La Habra, California (La Habra SFA), was assigned by the franchisee thereunder, Jahan Khorouzan, to PMI.

C. On or about October 26, 1982, the SFA covering the City of Milan, and the Counties of Dickson, Giles, Lincoln and Sumner (excluding greater Hendersonville), Tennessee (the Tennessee SFA), was partially assigned, as it related to Milan, Tennessee only, by the franchisee thereunder, Restaurant Management Corporation of Tennessee, to PMI.

D. On or about April 1, 1985, the franchise agreement covering the Virgin Islands (the Virgin Islands Franchise Agreement) was assigned by

the franchisee thereunder, Pizza Hut of The West Indies, to PMI. None of these franchise agreements are specifically described or listed in either the 1976 Agreement or the 1981 Blanket Amendment. Nor do these franchise agreements refer to either the 1976 Agreement or the 1981 Blanket Amendment. Each of these later-acquired franchise agreements contain provisions on the subject of and restricting transfers of interest in the franchise and in the operator.

11. On or about November 20, 1985, PMI and PHI entered into a transaction whereby PMI exchanged its franchise rights to certain counties in California, Illinois and Oregon for PHI's grant of franchise rights to PMI in certain counties in Texas (Texas Swap). As a part of the Texas Swap, PMI and PHI executed another SFA (Texas SFA) covering the acquired Texas territory. The Texas SFA is not described in either the 1976 Agreement or the 1981 Blanket Amendment. Nor does the Texas SFA refer to either the 1976 Agreement or the 1981 Blanket Amendment. The Texas SFA contains provisions on the subject of and restricting transfers of interest in the SFA and in the operator.

12. By letter dated May 2, 1986, plaintiffs informed PHI, Productos PepsiCo, S.A., Taco Bell and PepsiCo Food Service International (PFSI) that "pursuant to the various agreements between PHI and PMI that PMI" intends to make a public offering of PMI common stock. Plaintiffs allege in their second amended complaint that they gave notice on May 2, 1986, of their intention to do the public offering "pursuant to the terms and requirements of the 1976 Agreement and the 1981 Agreement."

13. PHI responded to this announcement by advising plaintiffs that consent would not be given to the proposed public offering unless at least 51% of PMI's voting stock would be maintained by an acceptable control group in non-public, non-registered shares. It is PHI's refusal to acquiesce in plaintiffs' demand for unqualified consent to its proposed public offering except on the condition that 51% of PMI's voting stock remain in private hands that forms the basis of plaintiffs' breach of contract claims.

14. PMI has never released or assigned its interests in the Tennessee SFA, the Virgin Islands Franchise Agreement or the Texas SFA. PMI was operating as the franchisee under those agreements at the time plaintiffs announced their proposal for an unrestricted public offering in May of 1986 and at the time this lawsuit was filed.

15. This court has held, as a matter of law, that neither the 1976 Agreement nor the 1981 Blanket Amendment applies to or amends the transfer of interest provisions of any of PMI's franchise agreements except for those specifically described in both agreements. (Plaintiffs misunderstand the court's statement in the order filed July 19, 1989, on their motion for reconsideration. In the defendants' earlier motion for partial summary judgment, they had argued in part that the 1976 Agreement no longer amended any of PMI's current franchise agreements, as twenty-five of the twenty-six franchise agreements listed therein had been superseded by the SFAs and the remaining Puerto Rico franchise agreement had expired on its own terms. (Dk. 207, pp. 28–31). At pages twenty-eight and twenty-nine of the April 14th order, the court explained it would not address this argument, because it was an alternative ground for the defendants' motion which was already being sustained by virtue of the court's interpretation that the 1976 Agreement and the 1981 Blanket Amendment applied only to the franchise agreements respectively listed in each. When plaintiffs' on reconsideration argued the court had ruled as a matter of law that they had the unrestricted right to a public offering on the franchise agreements listed in both the 1976 Agreement and the 1981 Blanket Amendment, the court pointed out it had not resolved the defendants' other arguments on the effectiveness of the 1976 Agreement and on Torres' personal rights under both agreements. (Dk. 354, p. 8). Plaintiffs' efforts are misplaced in construing this order to mean the court has not yet decided whether the 1976 Agreement ap-

plies to more than the franchise agreements listed therein. The court has consistently and firmly rejected this suggested interpretation of the 1976 Agreement.)

16. The Tennessee SFA, the Texas SFA, and the Virgin Islands Franchise Agreement contain integration clauses providing that the instrument is the entire agreement and that representations, inducements, promises or agreements, oral or otherwise, not found in the instrument shall have no force or effect.

17. The Tennessee SFA, the Texas SFA, and the Virgin Islands Franchise Agreement contain a provision requiring PHI's prior written consent to any proposed transfer in the franchise or in the operator. Both SFAs also set forth the circumstances under which PHI will or will not provide its consent to any proposed transfer.

18. In September of 1984, PHI advised PMI and its other franchisees of the manner in which it intended to exercise its rights under Article XVI of the SFA with respect to proposed public offerings by corporate franchisees and proposed transfers to public corporations. Under this "Public Corporation Policy," PHI would require that "at least 51% of the [public] corporation's voting stock [be held] in restricted, non-registered, non-public shares that are held by Pizza Hut approved owner/operators."

19. Implicitly by the order of April 14, 1989, and expressly by the order of July 19, 1989, this court construed the 1976 Agreement and the 1981 Blanket Amendment as not constituting the prior written consent for transfer that is required in the Tennessee SFA, the Texas SFA, and the Virgin Islands Franchise Agreement.

20. As of May 1, 1986, and today, PMI is a party to twenty-two SFAs. Each SFA provides:

A. Company and Operator are not and shall not be considered as joint venturers, partners or agents of each other, or anything other than franchisor and franchisee, and neither shall have the power to bind or obligate the other except as set forth in this Agreement.

B. Company and Operator further acknowledge and agree that the relationship created by this Agreement is not a fiduciary relationship.

Similar provisions are found in the franchise agreement by which PMI is operating the Virgin Islands. The franchise agreement governing PMI's operation in Puerto Rico only contains a provision similar to paragraph A.

21. Under date of December 27, 1984, PMI entered into a franchise agreement with Productos PepsiCo S.A. covering a territory in southern Spain which included the City of Barcelona (1984 Barcelona Agreement). Productos PepsiCo S.A. is a Spanish corporation, a subsidiary of PepsiCo, and the sublicensor of the "Pizza Hut" trademarks in the Country of Spain. The transfer of interest section of the 1984 Barcelona Agreement contains language similar to that found in the 1976 Agreement and the 1981 Blanket Amendment.

22. The 1984 Barcelona Agreement provides that "[t]he rights and obligations contained in the following provisions of this Agreement shall survive the expiration or termination of this Agreement: Articles VI, VII.B, IX, XI, XII, XIV, XVI, XVIII, XXI and XXV." As part of the transaction, PHI guaranteed the performance of Productos PepsiCo S.A.'s obligations under the 1984 Barcelona Agreement.

23. Under date of November 1, 1985, a second franchise agreement encompassing the same, and more, geographical territory in southern Spain was executed by Productos PepsiCo S.A. and PMI's wholly-owned subsidiary, Pizza Management de Espana S.A. (1985 Barcelona Agreement). The 1985 Barcelona Agreement provides in part:

This Agreement and appendices hereto express fully the understanding between the Operator and the Company as to the Territory defined herein and all prior understandings, appointments, licenses or agreements, oral or written, in respect of Pizza Hut and the Company are hereby cancelled.

24. In May of 1986, PMI reached an agreement to purchase from John Finerty

the stock of Restaurant Associates S.A., the "Pizza Hut" franchisee in Madrid, Spain.

25. Restaurant Associates S.A. held its "Pizza Hut" franchise rights to Madrid, Spain under a franchise agreement with Productos PepsiCo S.A., the sub-licensor of the "Pizza Hut" trademarks for the Country of Spain.

26. The franchise agreement between Restaurant Associates S.A. and Productos PepsiCo S.A. prohibited transfers of interest in the franchise or in Restaurant Associates S.A. "without the prior written consent" of Productos PepsiCo S.A.

27. At the end of May of 1986, Art Torres discussed PMI's acquisition of Restaurant Associates S.A. with John Wright, a vice-president of PFSI, and Gil Butler, president of PFSI and a vice-president of PHI. John Wright has testified that he told Torres that he "didn't see any reason why we couldn't proceed subject to review of the documents and the terms of the transaction." On May 30, 1986, Wright sent Torres a telex stating, in part: "I have received your request for approval of your acquisition of the Madrid, Spain franchise. As you are aware, this will require a review of our existing franchise agreement with John Finerty and the details of the proposed transaction." Gil Butler has testified that Torres asked him for approval of the transaction and that he told Torres that he "was unwilling to make that decision without the counsel and input of" his management group. Butler also told Torres that he was acceptable based on past experience but that no decision would be made without considering "the specifics of Spain and talking" to his management team. Torres has testified that he called Gil Butler on May 29th, obtained permission from him on the transaction, and signed the agreement on May 30th. (Dk. 333, p. 9, ¶ 18).

28. By letter dated June 4, 1986, L.D. Klenda sent a Release and Assignment and a Consent and Acceptance to Productos PepsiCo S.A. regarding PMI's acquisition of the stock of Restaurant Associates S.A. (Dk. 333, p. 10, ¶ 19).

29. The transfer between Restaurant Associates S.A. and PMI was not approved. Gil Butler has testified to three reasons for that decision: 1) the unresolved issue as to PMI's public ownership rights, 2) the necessary paperwork was never submitted, and 3) PMI's decision to go forward with the transfer without obtaining first the formal written approval of the franchisor. Mr. Wright has testified that he did not know of a "business reason" for not approving the transfer.

30. John Finerty has testified, and plaintiffs agree, that the transfer of his Restaurant Associates' stock was, at all times, to be conditioned upon a public offering of PMI stock, including some of the PMI stock that Finerty would receive as part of the transaction. Finerty has said that he would not have entered into the Stock Exchange Agreement without it being conditional.

31. PMI closed its transaction with Finerty and acquired the stock of Restaurant Associates S.A. without first obtaining Productos PepsiCo S.A.'s prior *written* consent.

32. Defendant PepsiCo is not a signatory party to any contract at issue herein with either plaintiff.

### ALTER EGO

Defendant PepsiCo first seeks summary judgment on counts I, II, VII, VIII, IX and XII of the second amended complaint as it is not a party to the contracts which are the subject of those counts. Since defendants' motion to dismiss counts II and XII has been granted, the court will confine its attention to the remaining counts. Plaintiffs call upon two theories to assert PepsiCo's liability on these counts—civil conspiracy and alter ego doctrine. Due to the court's prior dismissal of the civil conspiracy count, the alter ego doctrine is the sole remaining theory for potentially holding PepsiCo liable on these counts.

A corporation and its stockholders are "presumed separate and distinct" regardless of the number of its stockholders.

*Amoco Chemicals Corporation v. Bach,* 222 Kan. 589, 593, 567 P.2d 1337 (1977). The corporate identity is disregarded or pierced as the alter ego of the stockholder when the corporation has been used as a mere instrumentality for the stockholder to carry out his personal business and when to permit a separate corporate identity would result in fraud and injustice. *Kilpatrick Bros., Inc. v. Poynter,* 205 Kan. 787, 797, 473 P.2d 33 (1970); *Ramsey v. Adams,* 4 Kan.App.2d 184, 186, 603 P.2d 1025 (1979). The piercing of a corporate veil is done with reluctance and caution. *Bach,* 222 Kan. at 593, 567 P.2d 1337.

Plaintiffs maintain that they first asserted the alter ego doctrine in their second amended complaint and, therefore, additional time for discovery is necessary. The court has scoured the second amended complaint in search of "a short and plain statement" of this claim and has found none. Fed.R.Civ.P. 8(a)(2). The sufficiency of alter ego claims has been measured by the standards of Rule 8(a)(2) and with particular attention given to the requirement that "the complaint must put the opposing party on fair notice of the nature and grounds of the claim." *Allied Corp. v. Frola,* 701 F.Supp. 1084, 1089 (D.N.J.1988) (citation omitted); *see generally U.S. v. Van Diviner,* 822 F.2d 960, 964 (10th Cir.1987); *Truglia v. KFC Corp.,* 692 F.Supp. 271, 275 (S.D.N.Y.1988), *aff'd,* 875 F.2d 308 (2nd Cir.1989). Plaintiffs have not even asserted in their complaint any of the conclusory references or allegations associated with this doctrine, such as "alter ego," "mere instrumentality," or "piercing the corporate veil." Merely naming the sole shareholder as a defendant is insufficient to allege an alter ego theory. *See Intern. Brotherhood of Elec. Workers, No. 332 v. Hyland Wilson Elec. Contractors, Inc.,* 881 F.2d 820, 821 (9th Cir.1989). Plaintiffs having failed to plead an alter ego claim, the defendant PepsiCo is entitled to summary judgment on plaintiffs' claims I, VII, VIII, and IX.

## COUNT I—BREACH OF CONTRACT

In a disjointed and ambiguous manner, plaintiffs allege a number of breaches of several agreements in this count. The summary judgment pleadings reflect some confusion over the claims being advanced. In hopes of clarifying its rulings on this motion, the court sets forth its understanding of the claims pleaded in count I.

C-1. By refusing to give their unqualified consent to PMI for the public offering, defendants violated plaintiffs' personal rights in the 1976 Agreement, the 1981 Blanket Amendment and the 1984 Barcelona Agreement to go public without restriction or reference to any specific territories. (Dk. 385, ¶¶ 23, 24).

C-2. By refusing to give their unqualified consent to PMI for the public offering, defendants violated the SFAs and other franchise agreements which require them to give such consent to PMI's proposed public offering. (¶ 25).

C-3. By withholding their consent to the public offering, the defendants violated the SFAs and other franchise agreements which either expressly require the franchisor to "not unreasonably withhold consent" to transfers of PMI stock or do not require consent to such transfers of stock. (¶ 28).

C-4. By conditioning their consent to the public offering upon Torres or a control group retaining, by contract, 51% of PMI's stock, defendants breached the SFAs and other franchise agreements because the 1976 Agreement, the 1981 Blanket Amendment, and the 1984 Barcelona Agreement constitute prior written consent to the intended public offering. (¶ 29).

C-5. By maintaining that the public offering would have caused a transfer of control of PMI, defendants breached the SFAs, because this requirement does not exist therein. (¶ 30).

C-6. By conditioning their consent to the retention of 51% of PMI stock in an approved control group, defendants breached the SFAs, if the court declares, as requested in count III, that the term "control" does not mean 51%. (¶ 31).

The above is a fair and liberal construction of plaintiffs' claims pleaded in count I. When necessary, the court will refer to the

above claims by these numbers. In ¶ 26 of count I, plaintiffs allege Torres was an intended beneficiary to each of these agreements. The court did not include this claim above since the analysis of the other claims should be equally binding on Torres' claimed third-party rights. In ¶ 27, plaintiffs generally allege PHI's refusal to give an unqualified consent constitutes a breach of contract. Though this paragraph is not specifically cited in the above claims, its allegations are adequately covered by C–1 through C–4. Defendants seek summary judgment on each of these claims organizing their arguments by the appertaining contract.

### 1976 AGREEMENT AND 1981 BLANKET AMENDMENT—(C–1 AND C–4)

To the extent that plaintiffs' claims allege breaches of the 1976 Agreement and 1981 Blanket Amendment, defendants request summary judgment on the strength of the court's prior decisions on these same theories and claims constituting the law of the case. At pages fifty-nine through ninety-six of their brief in opposition, plaintiffs first give the court the opportunity to reconsider its earlier decisions, and then they make an effort to resurrect their unsuccessful claims and parol evidence arguments for breach of the 1976 Agreement and the 1981 Blanket Amendment by clothing them in the legal theories of mutual mistake, reformation, and promissory estoppel. Plaintiffs' arguments are made for naught.

In the orders of April 14, 1989, and July 19, 1989, this court definitively stated its interpretation of the relevant provisions of the 1976 Agreement and the 1981 Blanket Amendment. The court later explained in the order of September 21, 1989, that those interpretations constituted the law of the case and would not be subject to further litigation. Plaintiffs arguments were fully presented initially in their motion for partial summary judgment (Dk. 208), later in their response to the defendants' motion for partial summary judgment (Dk. 224), and subsequently in their motion to reconsider (Dk. 342). Plaintiffs have been given a full and fair opportunity to litigate their claims and issues concerning the 1976 Agreement and the 1981 Blanket Amendment. The court will not revisit them. The need to take up plaintiffs' theories of mutual mistake, integration and reformation, has been obviated by the court's ruling that the reformation claim is barred by the statute of limitations. In addition, the court has sustained defendants' motion to dismiss the plaintiffs' promissory estoppel count pleaded in regards to the 1976 Agreement and the 1981 Blanket Amendment. The court grants summary judgment on the claims C–1 and C–4 to the extent they are based upon the 1976 Agreement and the 1981 Blanket Amendment.

### THE 1984 BARCELONA AGREEMENT—(C–1 AND C–4)

Since the 1984 Barcelona Agreement contains the same public offering provision found in the 1976 Agreement and the 1981 Blanket Amendment, plaintiffs claim the 1984 Barcelona Agreement provides them the same personal and legal rights to a unqualified public offering and has the same legal effect that they sought from the earlier agreements. These are also the same rights and effect the court rejected when ruling that the 1976 Agreement and the 1981 Blanket Amendment applied only to the franchise agreements listed in each. Defendants argue the court's rationale in that decision applies with equal, if not greater, force to the 1984 Barcelona Agreement. Defendants also attack the viability of the 1984 Barcelona Agreement contending it was superseded or cancelled by the 1985 Barcelona Agreement.

Over a year later, plaintiffs now repeat their interpretation of this public offering provision that shareholders' rights in the transfer of PMI stock are created without any limitation or restriction to particular franchise agreements. Plaintiffs position is that the public offering provision at Article XIV(H) of the 1984 Barcelona Agreement is still enforceable despite the later execution of the 1985 Barcelona Agreement without a similar provision. At Article XXIX of the 1984 agreement, plaintiffs note, among the provisions surviving "expi-

ration or termination" of the agreement is Article XIV. The 1984 Barcelona Agreement was executed by Productos PepsiCo S.A., PMI and Torres, as an individual. Attached to this agreement is a "Guarantee" signed on behalf of PHI wherein it guarantees the performance, promises and obligations of Productos PepsiCo S.A. The 1985 Barcelona Agreement was executed only by Productos PepsiCo S.A. and Pizza Management De Espana S.A. PHI and PMI also guaranteed therein the performances and promises of their respective Spanish counterparts. Plaintiffs consider these facts and contract provisions to show the continuing effectiveness of Article XIV(H) of the 1984 Barcelona Agreement.

From its four corners, the unmistakable impression conveyed and only reasonable inference to be drawn is that the 1984 Barcelona Agreement is simply an individual franchise agreement covering a particular geographical territory. From its title to its recitals and operative provisions, this agreement speaks to the terms governing the franchise relationship between the "Company," Productos PepsiCo S.A., and the "Operator," PMI, for the Barcelona territory. PHI involved itself in the 1984 Barcelona Agreement exclusively as guarantor of the promises and obligations of Productos PepsiCo S.A. Plaintiffs have not sued Productos PepsiCo S.A. for breaching any term of this agreement in PMI's thwarted attempt to go public without any restrictions. As guarantor, PHI can have no greater obligations than its principal, Productos PepsiCo S.A., has under the agreement. *See Overland Park Savings & Loan Ass'n v. Miller*, 243 Kan. 730, 741, 763 P.2d 1092 (1988). Plaintiffs offer no plausible explanation of how Productos PepsiCo S.A., the sublicensor of the "Pizza Hut" trademarks in Spain, could legally convey to plaintiffs the expansive right to go public with those franchises held by them in the United States, the Virgin Islands and Puerto Rico. The 1984 Barcelona Agreement cannot be reasonably interpreted as PHI's promise to Torres and PMI of their right to go public regardless of the franchise territories affected. None of its provisions, including Article XIV(H),

transcend the 1984 Barcelona Agreement and its territorial limitation so as to modify any other franchises owned by plaintiffs.

The fact plaintiff Torres' individually executed only the 1984 Barcelona Agreement and not the 1985 Barcelona Agreement is easily explained and of little consequence. Torres' personal assurance to maintain ownership of 51% of the operator's shares is not a part of the 1985 Barcelona Agreement as it was in the 1984 agreement. Plaintiffs, nevertheless, believe this fact along with the survival clause in the 1984 Barcelona Agreement is adequate proof that Article XIV(H) is an extant, enforceable provision in its own right. The court understands plaintiffs' argument but finds it too tenuous to overcome the other plain terms of the 1984 Barcelona Agreement.

Moreover, the court believes the merger clause in the 1985 Barcelona Agreement and the survival clause in the 1984 Barcelona Agreement are mutually compatible upon understanding that they serve distinct purposes. In the event a franchise agreement is canceled or terminated, the survival clause supplies those terms important for the continued operation of the franchise territory. If, and when, a franchise agreement on a certain territory is replaced by the parties with a new franchise agreement, the merger clause in the latter agreement nullifies and cancels the terms of the former agreement. The effect of the merger clause in the 1985 Barcelona Agreement was to cancel the provisions of the 1984 Barcelona Agreement, including those set forth in its survival clause. When so construed, the merger and survival clauses are not contradicting, but mutually operate to preclude the undesirable alternative—two written agreements with potentially conflicting terms covering the same franchise territory.

The court has read the decision of *Kentucky Fried Chicken Corp. v. Collectramatic, Inc.*, 130 N.H. 680, 547 A.2d 245 (1988), cited by plaintiffs and finds it distinguishable on the facts. Its applicability to the present case requires Article XIV(H) in the 1984 agreement to be something more than it is—one term of a franchise agree-

ment covering a limited territory. Defendants' motion for summary judgment is granted as to claims C–1 and C–4.

## UNAMENDED OR AFTER–ACQUIRED FRANCHISE AGREEMENTS UNREASONABLY WITHHOLD CONSENT—(C–2 AND C–3)

Plaintiffs allege in these claims that defendants are obligated by way of the SFAs, other franchise agreements and the implied duty of good faith and fair dealing to not unreasonably withhold consent to any transfer or assignment of interest in the operator. Plaintiffs allege defendants breached these duties as to the proposed public offering in not giving unqualified consent or in conditioning their consent upon a 51% control group requirement.

Defendants argue the claims are vulnerable to summary judgment for several reasons. Plaintiffs never requested consent for the public offering. PHI had the express right under the SFAs to impose certain conditions to its consent which could not be met by plaintiffs in going public. Finally, PHI actually imposed conditions to its consent that were reasonable as a matter of law.

As of May 1986, plaintiffs were operating under three franchise agreements—Texas SFA, Tennessee SFA, and Virgin Islands Franchise Agreement—which were acquired after the execution of the 1981 Blanket Amendment and were not listed in nor affected by this amendment. Article XVI(B) of the two SFAs, in part, forbids an operator, who is a privately held corporation or a person, who holds an interest in the operator, from selling, assigning, transferring or conveying, directly or indirectly, an interest without the franchisor's prior written consent. The Virgin Islands Franchise Agreement likewise requires prior written consent before any transfer. Article XVI(D) of the SFAs also provides:

> *Company will not unreasonably withhold its consent to any transfer* or assignment which is subject to the restrictions of Article XVI; *provided, however, Company shall not be required to give its consent unless,* in addition to the requirements of Article XVII, *the following conditions are met prior to the effective date of the assignment:*

> 1. For all proposed transfers or assignments:

> ....

> c. The assignee has demonstrated to Company's satisfaction that it meets all of Company's then-current requirements for new Operators or for holders of an interest in a franchise, including, without limitation, possession of good moral character and reputation, satisfactory credit ratings, acceptable business qualifications, and the ability to comply fully with the terms of this Agreement;

> d. The assignee has entered into a written assignment under seal, in a form prescribed by Company, assuming and agreeing to discharge all of Operator's obligations;

> e. The assignee, its manager, and its other employees responsible for the operation of the restaurant have satisfactorily completed such training as Company may then require;

> f. The assignee executes such other documents as Company may require in order to assume all of the obligations of this Agreement, to the same extent, and with the same effect, as previously assumed by the assignor.

(emphasis supplied). The Virgin Islands Franchise Agreement has similar conditions.

Defendants first argue that plaintiffs, instead of requesting consent from PHI for their public offering, simply gave notice of their intentions. Article XVI(B) does not appear to require any particular form or procedure for obtaining the Company's consent to a proposed transfer. Defendants are correct that the plaintiffs' letter of May 2, 1986, does not specifically request consent from them for the public offering. Defendants, however, replied by letter of May 13, 1986, explaining their right to first refusal, requesting additional information for making that determination, stating their right to approve the new operator control group in the event they did not

exercise the right of first refusal, and explaining their need to review the SEC prospectus. Defendants clearly understood and treated the plaintiffs' May 2nd letter as a request for consent. Defendants' form over substance argument is without merit.

The above conditions and requirements to PHI's consent to transfer are irrefutable evidence that plaintiffs had no unrestricted right to a public offering under the terms of the SFAs. Without such a right, plaintiffs are not in a position to assert a breach by defendants for not recognizing a nonexistent right. Plaintiffs offer no evidence of their substantial compliance with those conditions. In fact, the very nature of a public offering of stock renders it veritably impossible for potential public purchasers of PMI's stock to satisfy, prior to the public offering, the above conditions imposed on proposed assignees. Since the SFAs expressly authorize PHI to condition its consent to a transfer of interest, defendants cannot have breached the SFAs, or any implied duty of good faith and fair dealing, by refusing to give an unconditional consent.

Plaintiffs cry "waiver" of those conditions because of defendants' involvement in the 1976 Agreement and the 1981 Blanket Amendment. This court has repeatedly stated and affirmed its interpretation of the limited scope to the 1976 Agreement and the 1981 Blanket Amendment. Changing the theory to waiver does not affect the result. These conditions set forth in the Texas SFA and Tennessee SFA are not amended or waived because of the 1976 Agreement or the 1981 Blanket Amendment. Waiver or estoppel is also claimed due to representations found in an internal memorandum prepared by PHI's legal department. Plaintiffs presumably first saw this document when it was produced during discovery. This intracorporate discussion of policies and contracts is not evidence of the type or weight to show intentional relinquishment of rights. Nor is it a fact or ground which plaintiffs could have relied upon in May of 1986.

The nonappearance of these other conditions to consent in PHI's letter of May 13, 1986, is another alleged basis for waiver. Even assuming this could constitute a waiver of those conditions not mentioned, a conclusion this court believes is not necessarily sustained by the language used in the letter, this changes little. When plaintiffs first asserted their right to an unqualified public offering, PHI had not yet written this letter or waived any of the conditions. But more importantly, defendants are not relying on those requirements as the reason for denying consent. They refer to them primarily to show their authority under the unamended SFAs to condition their consent to any requested transfer of interest.

Plaintiffs' other related claim is that defendants' assertion of the 51% control group condition on May 13th is a breach of the duty to not unreasonably withhold consent and the duty of good faith and fair dealing. At this point, some discussion of the implied covenant of good faith and fair dealing is necessary. Kansas courts have followed the trend of implying this covenant to almost every contract and finding that it entails both affirmative and negative duties. *See Bonanza, Inc.*, 242 Kan. at 222, 747 P.2d 792. As a doctrine susceptible to criticism for being too abstract and producing fact-specific decisions, courts have looked to the purpose of the implied covenant and used it to construe contracts and to prohibit improper performance of contracts. *See, e.g., Best v. U.S. National Bank*, 303 Or. 557, 562, 739 P.2d 554 (1987); *Martin v. Federal Life Ins. Co.*, 109 Ill.App.3d 596, 65 Ill.Dec. 143, 440 N.E.2d 998 (1982).

The implied covenant of good faith and fair dealing particularly comes into play in those circumstances where the parties to the contract realize detailed provisions on performance would be ineffectual, frustrating, or impractical. The parties are then forced to confer control of a contract term, or discretionary authority, upon one another, leaving each to depend on the good faith of the other. *See, e.g., Boone v. Kerr–McGee Oil Industries*, 217 F.2d 63,

65 (10th Cir.1954). By employing this doctrine, a court forces the parties to perform consistent with their intentions and expectations which are embodied, expressly and impliedly, in the terms of their agreement. For example, the duty of good faith could be breached by one party exercising its discretion for purposes not reasonably contemplated or assumed as a risk by the other party. *See Best*, 303 Or. at 563, 739 P.2d 554; *Boone*, 217 F.2d at 65; *see generally* Burton, *Breach of Contract and the Common Law Duty to Perform in Good Faith*, 94 Harv.L.Rev. 369, 383–387 (1980).

The implied covenant is derivative in nature, that is, it does not create or supply new contract terms but grows out of existing ones. *See Metromedia Broadcasting v. MGM/UA Entertainment*, 611 F.Supp. 415, 421 (D.Cal.1985); *Gordon v. Matthew Bender & Co., Inc.*, 562 F.Supp. 1286, 1289 (N.D.Ill.1983); *Adolph Coors Co. v. Rodriguez*, 780 S.W.2d 477, 482 (Tex. Ct.App.1989). " '[E]ssential terms of a contract on which the minds of the parties have not met cannot be supplied by the implication of good faith and fair dealing.' " *Bonanza, Inc.*, 242 Kan. at 222, 747 P.2d 792 (quoting 17 Am.Jur.2d, Contracts § 256, pp. 653–54 (1964)); *see Metromedia Broadcasting*, 611 F.Supp. at 421 (the implied covenant does not supply new or different rights and obligations to those expressly agreed to by the parties); *Gordon*, 562 F.Supp. at 1289–90 (an obligation cannot be implied if it would be inconsistent with other express terms of the contract). The duty of good faith assumes the existence of a contractual right; it does not create one. *Noller v. General Motors Corp.*, 13 Kan.App.2d at 35, 760 P.2d 688 (J. Davis, concurring and dissenting). Because the goal of this implied duty is to effectuate the parties' express promises, breach of this duty is actionable when it relates "to some aspect of performance under the terms of the contract." *Adolph Coors Co.*, 780 S.W.2d at 482. A breach occurs when a party's actions are commercially unreasonable. *Larese v. Creamland Dairies, Inc.*, 767 F.2d 716, 717–18 (10th Cir.1985); *Burgess Const. Co. v. M. Morrin & Son Co., Inc.*, 526 F.2d 108, 115 (10th Cir.1975), *cert. denied*, 429 U.S. 866, 97 S.Ct. 176, 50 L.Ed.2d 146 (1976); *see* Restatement (Second) of Contracts § 205 comment d (1979) ("abuse of a power to specify terms").

The question of whether PHI's imposition of the 51% control group condition was unreasonable is two-pronged. First, is the condition itself reasonable as to any public offering. Second, is the condition reasonable as applied to the circumstances surrounding the plaintiffs' proposed public offering.

It is undeniable that the SFAs create express conditions to PHI's consent for a transfer of interest which practically preclude a privately held corporation from making a public offering. Plaintiffs have not controverted the fact that PHI's announced corporate policy of September 1984 allows for the possibility of a private corporation to go public with at least its minority shares. Defendants concede the corporate policy is not a negotiated term of any contract with the plaintiffs. Even so, the corporate policy gives the private franchisees the desired opportunity of creating additional capital by way of a public offering. The imposition of a less restrictive and favorable condition in lieu of several preclusive conditions mandated by contract is conduct that does not even approach such labels as unreasonable or bad faith.

The corporate policy also affords PHI a reasonable means to assure the franchise is managed by an identifiable owner or operator, individual or group, which it finds acceptable. If more than 50% of the franchisee's stock goes public, a public shareholder, who is unknown and possibly unacceptable to PHI, could become the majority shareholder overnight. This conceivable occurrence could obviously place the franchisor's protected trade secrets at risk if the majority shareholder was a competitor. Though PHI may always have the ultimate and drastic remedy of terminating the franchise under these circumstances, there is nothing unreasonable about a franchisor taking fair and purposeful steps, short of termination, to provide itself with a measure of control over who may become its

franchisees and, in turn, assure a measure of continuity in the operation of its franchises.

There is nothing unusual or unique in the circumstances of plaintiffs' proposed public offering which causes the defendants' application of the control group condition to be unreasonable. In most contexts the reasonableness of challenged conduct is a question of fact. What makes the present case an exception is that defendants' decision to refuse an unqualified consent did not entail any evaluation or weighing of facts. Instead, the alleged breach occurred upon defendants asserting their corporate policy position on consent to a public offering. Plaintiffs did not attempt to comply with that policy, but defied it as wholly inconsistent with their unique contractual rights.

Calling again upon their parol evidence to the 1976 Agreement, the 1981 Blanket Amendment, the 1984 Barcelona Agreement and the Texas Swap, plaintiffs argue defendants' actions constitute a waiver of all conditions to plaintiffs' public offering at any time. None of this evidence raises a material question of fact over whether, at the time, or anytime after, the unamended SFAs and franchise agreements were executed, PHI knowingly and intentionally relinquished its rights to approve transfers of interest under the unamended agreements. Conduct or statements occurring sometime before the parties formalize their understandings in writing are not a tenable basis for asserting waiver of terms found in subsequent written contracts. If this were not so, the parol evidence rule would be a nullity.

Plaintiffs also consider the condition unreasonable as applied to them because of their rights under the 1981 Blanket Amendment to go public with the amended franchise agreements. This argument is a disguised attempt to insert the terms of the Blanket Amendment into the unamended franchise agreement. The implied obligation of good faith is not a basis for reading different or new terms into the unamended SFAs. For the same reason, the court attaches no significance to the

fact that a majority of the franchise agreements owned by PMI may be amended by the 1981 Blanket Amendment. As a matter of law, the plaintiffs have failed to show the 51% control group condition, in itself or in its application to them, to be unreasonable. Defendants are entitled to summary judgment as to claims C–2 and C–3.

UNAMENDED OR AFTER–ACQUIRED FRANCHISE AGREEMENTS TRANSFER OF CONTROL—(C–5 AND C–6)

In these claims plaintiffs once more allege defendants breached the unamended SFAs and franchise agreements in refusing to consent to the public offering without the 51% control group requirement. The contract language at issue in this claim appears in the SFAs at Article XVI(B) which reads:

> The rights and duties created by this Agreement are personal to Operator, and Company has granted this franchise in reliance on the individual or collective character, skill, aptitude and business and financial capacity of Operator and its principals. Accordingly, except as otherwise may be permitted in Article XVI. and Article XVIII., *neither Operator nor any person with an interest in Operator shall, without Company's prior written consent, directly or indirectly sell, assign, transfer, convey,* give away, pledge, mortgage or otherwise encumber *any direct or indirect interest in this franchise; any interest in Operator, if Operator is* a partnership, joint venture, or *privately held corporation; or* any interest which, together with other related previous, simultaneous or proposed transfers, constitutes a *transfer of control of Operator where Operator is registered under the Securities Exchange Act of 1934.* Any such purported assignment occurring by operation of law or otherwise without Company's prior written consent shall constitute a default of this Agreement by Operator, and shall be null and void.

(emphasis supplied). Alleging their proposed public offering would not have con-

stituted a "transfer of control" as defined under the securities laws, plaintiffs claim that they did not need PHI's prior written consent.

Defendants first argue that assuming the provision applies as argued by plaintiffs then defendants could not have breached the SFAs by refusing to give a consent that was not required under them. The court agrees with plaintiffs that this argument may be pierced as a matter of semantics, if under the securities rules, a condition to plaintiffs' public offering was defendants condoning it. For the sake of argument, the court will accept this point.

■ Next, defendants contend the "transfer of control" language exclusively applies to corporations that are already public and does not affect privately held corporations planning or anticipating to go public. This argument subsumes that the reference to operators "registered under the Securities Act of 1934" means those operators which are existing public corporations. As defendants note, the court need not go so far as to decide that the reference to the 1934 Act means public corporations, since the plaintiffs openly admit they were not registered under the Act at the time of the alleged breach. Plaintiffs consider this last argument circular. But for defendants' actions, plaintiffs state they "would have been a 1934 Act company."

There is nothing in the SFAs to suggest that the language, "is registered under the Securities Act of 1934," was intended to read "planning to register under the Securities Act of 1934." For purposes of prior written consent to transfers, Article XVI(B) clearly distinguishes between privately held corporations and those operators that are currently registered under the 1934 Act. The plain meaning of "is registered" does not allow for prospective actions or mere intentions. It is uncontroverted that plaintiffs were not registered under the 1934 Act at the time of the breach. Without this fact, plaintiffs cannot claim any benefits of this inapplicable term of the SFAs. Based upon all of the above stated reasons, defendants are entitled to summary judgment on count I of plaintiffs' second amended complaint.

## COUNT V—PROMISSORY ESTOPPEL

In its above ruling on the motion to dismiss, the court summarized the claims in this count and, thereafter, dismissed plaintiffs' claim of tortious interference with contract. To briefly repeat, plaintiffs allege in their promissory estoppel claim that PepsiCo verbally approved PMI's acquisition of Finerty's stock in Restaurant Associates S.A. and then later refused to confirm that consent in writing. Plaintiffs seek to estop PepsiCo from withholding its formal written confirmation of consent to the transfer of ownership. PepsiCo, the only defendant named in this count, now seeks summary judgment on the promissory estoppel claim arguing that it is not a party to the subject franchise agreement and that its oral consent to any transfer is not a requirement under that franchise agreement.

As previously stated in ¶¶ 25 and 26 of the uncontroverted facts, the "Pizza Hut" franchise rights in Madrid, Spain were held by Restaurant Associates S.A. as a result of a franchise agreement with Productos PepsiCo S.A. This franchise agreement bars Restaurant Associates S.A. from transferring its interest in the franchise "without the prior written consent" of Productos PepsiCo S.A. PepsiCo is not a party to that franchise agreement, and its consent, written or oral, is not a condition to any transfer of interest by Restaurant Associates S.A. PepsiCo contends summary judgment is necessary because Productos PepsiCo S.A. is not a party to this action and any relief plaintiff could obtain against PepsiCo on this claim would not affect the terms of the franchise agreement between Productos Pepsico S.A. and Restaurant Associates S.A.

Plaintiffs believe PepsiCo's argument "misses the point," which they state to be that Gil Butler, president of PFSI and a vice-president of PHI, and John Wright, a vice-president of PFSI, made binding representations that estop PepsiCo from denying consent to the transfer between PMI and

Restaurant Associates S.A. Quite frankly, this court has also missed plaintiffs' point on this claim. Plaintiffs do not explain how PepsiCo's consent to the transfer, which is not a requirement of the franchise agreement, legally equates with Productos PepsiCo S.A.'s written consent to the transfer, which is a requirement of the franchise agreement. Whether or not Butler and Wright may be agents of both PepsiCo and PFSI is immaterial without some legal theory supporting the proposition that a court's equitable order against PepsiCo, a corporate party to the action, would achieve the requested relief under the franchise agreement that could only be accorded by entering an order against Productos PepsiCo S.A, a corporation that is not a party to the action. In addition, since it is the written consent of Productos PepsiCo S.A. that is required by contract, a jury could not properly find that plaintiffs' reasonably relied on the oral "conditional" consent from individuals not shown to have the actual or apparent authority to act on behalf of Productos PepsiCo S.A. For these reasons, defendants' motion for summary judgment on the promissory estoppel claim in count V is granted.

## COUNT IX—BREACH OF FIDUCIARY DUTY AND BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING

Count IX alleges defendants breached certain fiduciary duties and duties of good faith and fair dealing by their actions in seven alleged instances. Defendants request summary judgment contending that there is no basis in law or fact for them to owe any fiduciary obligations to plaintiffs and that the alleged breaches of good faith and fair dealing are not actionable.

■ As a legal concept, the fiduciary relationship is not reducible to any technical elements and is not compatible with any encompassing, uniform definition. Its existence is generally a question of fact decided from the circumstances of each case. *Olson v. Harshman,* 233 Kan. 1055, 1057, 668 P.2d 147 (1983). Its existence is not a matter of presumption but a burden to be proved by the party asserting it. *Paul v. Smith,* 191 Kan. 163, 170, 380 P.2d 421 (1963). In *Olson,* the Kansas Supreme Court set forth some of the broad equitable principles which govern this issue:

It may be said that generally there are two types of fiduciary relationships: (1) those specifically created by contract such as principal and agent ..., and (2) those implied in law due to the factual situation surrounding the involved transactions and the relationship of the parties to each other and to the questioned transactions.... The second category, ... must depend upon the facts in each case.

. . . .

The concept of the fiduciary duty is an equitable one and while no precise definition may be given and strict parameters of the relationship cannot be established for use in all cases, there are certain broad general principles which should be considered in making the determination of whether a fiduciary relationship exists in any particular factual situation.

A fiduciary relationship imparts a position of *peculiar confidence placed by one individual in another.* A fiduciary is a person with a *duty to act primarily for the benefit of another.* A fiduciary is in a position to have and exercise, and does *have and exercise influence over another.* A fiduciary relationship implies a condition of *superiority of one of the parties over the other.* Generally, in a fiduciary relationship, the property, interest or authority of the other is *placed in the charge of the fiduciary.* (Citation omitted).

. . . .

[I]t extends to every possible case in which a fiduciary relation exists in fact, and in which there is *confidence reposed* on one side *and resulting domination and influence* on the other. (Citation omitted).

. . . .

There is no invariable rule which determines the existence of a fiduciary relationship, but it is manifest in all the decisions that there must be not only

confidence of the one in the other, but there must exist a certain inequality, dependence, weakness of age, of mental strength, business intelligence, knowledge of the facts involved, or other conditions, *giving to one advantage over the other.* (Citations omitted).

233 Kan. at 1058, 668 P.2d 147 (quoting *Denison State Bank v. Madeira,* 230 Kan. 684, 691–92, 640 P.2d 1235 (1982)) (emphasis in original). The court must first determine whether Kansas law would recognize a franchise relationship to implicate fiducial obligations and, if not, then whether the facts and circumstances between the parties could justify implying a fiduciary relation.

The franchisor—franchisee relationship is typically not fiducial or confidential in nature, and a franchise agreement generally does not give rise to a fiduciary relationship. *See, e.g., McGuirk Oil Co., Inc. v. Amoco Oil Co.,* 889 F.2d 734, 737 (6th Cir.1989) (Tennessee law); *O'Neal v. Burger Chef Systems, Inc.,* 860 F.2d 1341, 1349 (6th Cir.1988) (Tennessee law); *Premier Wine & Spirits v. E. & J. Gallo Winery,* 846 F.2d 537, 540 (9th Cir.1988) (South Dakota law); *Cambee's Furniture v. Doughboy Recreational, Inc.,* 825 F.2d 167, 171 (8th Cir.1987) (South Dakota law); *Rosenberg v. Pillsbury Co.,* 718 F.Supp. 1146, 1155 (S.D.N.Y.1989) (Massachusetts law); *Layton v. AAMCO Transmissions, Inc.,* 717 F.Supp. 368, 371 (D.Md.1989) (Maryland law); *Bonfield v. AAMCO Transmissions, Inc.,* 708 F.Supp. 867, 883–84 (N.D.Ill.1989) (Illinois law); *Power Motive Corp. v. Mannesmann Demag Corp.,* 617 F.Supp. 1048, 1051 (D.Colo.1985) (Ohio law). The vast majority of courts have followed this rule. *O'Neal,* 860 F.2d at 1349 n. 4 (and the compendium of cases cited in that footnote).

Plaintiffs suggest the leading case on this issue is *Arnott v. American Oil Co.,* 609 F.2d 873 (8th Cir.1979), *cert. denied,* 446 U.S. 918, 100 S.Ct. 1852, 64 L.Ed.2d 272 (1980). Not only is *Arnott* the distinct minority approach on this topic, but its precedential weight has been seriously undermined by subsequent decisions from the Eighth Circuit. *Arnott* has been construed

as a holding grounded on the implied covenant of good faith and fair dealing and as no authority for the proposition that a franchise relationship alone creates fiduciary duties. *Cambee's Furniture v. Doughboy Recreational, Inc.,* 825 F.2d 167, 171 (8th Cir.1987) (citing *Bain v. Champlin Petroleum Co.,* 692 F.2d 43, 47–48 (8th Cir. 1982)). *Arnott* and those cases relying on *Arnott,* which plaintiffs have cited in support of their argument, are dubious authority at best.

The franchisor—franchisee relationship "is an arms-length, commercial one" with the performance of each governed and regulated by the typically exhaustive terms of written franchise agreements. *Rosenberg,* 718 F.Supp. at 1155. It is the very nature of franchising that both parties enter into their agreement trusting on the fairness and good faith of the other. Fiduciary obligations should be extended reluctantly to commercial or business transactions. *See Ritchie Enterprises,* 730 F.Supp. at 1052; *LNS Investment Co. Inc. v. Phillips 66 Co.,* No. 87–2215–O, 1989 WL 103637 (D.Kan. Aug. 29, 1989); *Adams Parker Furniture, Inc., v. Ethan Allen, Inc.,* No. 86–2113–S, 1987 WL 56676 (D.Kan. Oct. 13, 1987) (1987 U.S. Dist. Lexis 10244).

Plaintiffs refer to numerous terms of the franchise agreements which they believe show PHI's overweening control of the franchisees' operation and performance. Taken individually or together, these instances of discretion or authority under the contract do not make PHI anything more than a common franchisor. A franchisee's reasonable expectations are sufficiently protected by the standard of good faith and fair dealing governing the franchisor's exercise of contractual responsibilities and powers. *Power Motive Corp.,* 617 F.Supp. at 1052; *see Bain v. Champlin Petroleum,* 692 F.2d 43, 47–48 (8th Cir.1982). This court has no cause to believe Kansas law would impose fiducial obligations on a franchisor for the sole reason of that status.

No triable issue of fact emerges from plaintiffs' contentions that their unique relationship with defendants was fiduciary in

nature. By the very terms of the franchise agreement, the parties disavow any fiduciary relationship between them. Since plaintiffs and defendants are both sophisticated business entities, well-equipped to negotiate desirable contract terms, this court will not relegate this provision of their franchise agreement to inconsequential boilerplate. "Undoubtedly, parties may deal at arm's length for their mutual profit. It is only when, by their concerted action, they willingly and knowingly act for one another in a manner to impose mutual trust and confidence that a fiduciary relationship arises." *Paul*, 191 Kan. at 170, 380 P.2d 421. There is nothing in the evidence of record to show plaintiffs placed any confidence and trust in defendants over and above what must be inherent in any relationship between a franchisor and its franchisee. Plaintiffs' allegations do not remove them from the mainstream of franchisor—franchisee relationships.

A party cannot "unilaterally impose a fiduciary relationship on another without a conscious assumption of such duties by the one sought to be held liable as a fiduciary." *Denison State Bank*, 230 Kan. at 696, 640 P.2d 1235. The September 1976 letter from PHI's counsel cannot be reasonably construed as a conscious assumption of fiduciary duties. Plaintiffs take portions of their franchise arrangement with defendants and hold them up as fitting the equitable principles associated with fiduciary relationships. The general definitions of fiduciary relationships found in case law carry only meaningful value in the factual context of those cases. *Bain*, 692 F.2d at 47. In the setting of a commercial contract between two equally sophisticated business entities, this court is not prepared to impose heightened legal duties on one of the parties simply because that party may have more powers and discretion under the express terms of their agreement. Defendants are entitled to summary judgment on plaintiffs' breach of fiduciary duty claim.

As stated before, defendants also seek summary judgment on plaintiffs' claim of breach of good faith and fair dealing. In this claim, plaintiffs allege defendants breached this duty by taking the following

actions: (a) refusing to allow the public offering in May of 1986; (b) attempting to terminate or not renew plaintiffs' franchises without justification; (c) wrongfully refusing PMI's request to acquire other PHI franchises; (d) refusing to abide by previous agreements; (e) intentionally interfering with PMI's routine acquisition and transfer of franchises in furtherance of defendants' motive to inhibit PMI's competition with PHI; (f) asserting PMI's default on the basis of actions that have been waived or that defendants are estopped from asserting; and (g) arbitrarily designating PMI as a "franchisee not in good standing."

Defendants note that alleged breaches, (a), (b) and (d), are repetitious of claims pleaded in other counts. In particular, (a) and (d) are necessarily contained in count I and have been addressed by the summary judgment ruling on that count. The breach in (b) is effectively alleged by counts VII and VIII. Plaintiffs respond that these claims stand in their own right since they are intended to sound in tort. The court has held already in this order that Kansas does not recognize the tort of breach of the covenant of good faith and fair dealing implied in a commercial contract. Defendants' motion is granted as to breaches (a), (b) and (d).

Concerning breaches (c), (e), (f) and (g), defendants contend none of the rights or duties alleged therein are linked or related to some aspect of performance under the terms of their agreements. As has been articulated in this order, the implied duty of good faith only amplifies duties and rights existing under the terms of an agreement; it does not generate new or different provisions. Consequently, plaintiffs must point to some right or duty found within an agreement between them which the defendants allegedly violated by failing to abide by the good faith spirit of that term.

Defendants challenge plaintiffs to identify in their agreements a right they have to acquire other franchises. Plaintiffs fail the challenge and refer only to terms of the franchise agreement between PHI and the

franchisee who would be seeking to transfer his interest to PMI. The Kansas Supreme Court rejected this very same argument of third-party rights in *Noller*. 244 Kan. at 617–19, 772 P.2d 271.

As to breach (f), the defendants correctly identify this to be a vague allegation that is more likely to be a defense instead of a claim for affirmative relief. Plaintiffs explain their allegations to refer primarily to their ongoing duty during this lawsuit to maintain the development schedules and improvement of the territories under the franchise agreements in which PHI is claiming are or will be terminated for PMI's defaults. Because of their capital investment in this development of the franchises, plaintiffs claim defendants either have waived or should be estopped from asserting PMI's defaults. PHI's right to terminate franchise agreements is clearly expressed in the agreements and that right must be exercised reasonably or in good faith. Plaintiffs are essentially claiming the defendants have breached the duty of good faith in continuing to seek termination of the franchises through this lawsuit when plaintiffs have upheld their obligations during the interim of developing and improving the franchise territories. Whether or not legally cognizable for other reasons, since this claim is linked to PHI's right to terminate under the franchise agreements, defendants' argument does not prevail and their motion is denied as to breach (f).

Defendants take the same line of attack as to breach (g)—it does not relate to some aspect of PHI's performance under the franchise agreements. Plaintiffs concede this point in responding: "Unequivocally, this is the reason that courts have mandated the imposition of the duty of good faith and fair dealing." (Dk. 406 p. 199). Plaintiffs assert the duty of good faith and fair dealing restricts PHI from unreasonably treating them in a manner different from other franchisees. Instead of a free floating code of business conduct, the duty of good faith holds a party to the expectations and intentions expressed in the agreement. Because plaintiffs have chosen not to state what contractual right or duty is implicated by this claim for breach of good faith, summary judgment is appropriate.

Defendants' motion is sustained on all claims in count IX except for the breach of the duty of good faith and fair dealing alleged in ¶ 63(f) of the second amended complaint. Under Kansas law, this remaining claim must sound in contract and not in tort. Therefore, plaintiffs prayer for punitive damages in count IX is also dismissed.

IT IS THEREFORE ORDERED that defendants' motion to dismiss counts II, IV, VI and XII of the second amended complaint is granted;

IT IS FURTHER ORDERED that defendants' motion to dismiss the tortious interference with contract claim pleaded in count V of the second amended complaint is granted;

IT IS FURTHER ORDERED that defendants' motion to dismiss the punitive damages claim pleaded in count X of the second amended complaint is granted;

IT IS FURTHER ORDERED that defendant PepsiCo's motion for summary judgment on counts I, V, VII, VIII and IX of the second amended complaint is granted;

IT IS FURTHER ORDERED that defendants' motion for summary judgment on count I of the second amended complaint is granted;

IT IS FURTHER ORDERED that defendants' motion for summary judgment on count IX of the second amended complaint is granted on all claims, including punitive damages, except for the breach of good faith and fair dealing claim pleaded in ¶ 63(f).